MERICI, LLC
782 N.W. LeJeune Road, Suite 635
Miami, Florida 33126

July 2, 2010

DINURO INVESTMENT, LLC
Attention: Mr. Marco Romagnoli
3237 NE 212th Street
Aventura, Florida 33180

DINURO INVESTMENT, LLC
Attention: Mr. Roberto Romagnoli
9401 Collins Avenue, Apt. 1103
Surf Side, Florida 33154

      Re:    SR ACQUISITIONS, LLC – Reservation and Subscription Agreement

Dear Sirs:

The purpose of this letter is to offer DINURO INVESTMENT, LLC ("DINURO") an opportunity to invest in SR ACQUISITIONS, LLC, a to-be-formed Florida limited liability company (the "Company"). The Company will be formed to purchase that certain Loan No. 10171114863 by and between Ocean Bank and San Remo Homes at Florida City, LLC and that certain Loan No. 10154291563 by and between Ocean Bank and San Remo Homes at Homestead, LLC (collectively, the "Loans") from Ocean Bank. In this regard, the undersigned would like to offer membership interests (the "Units") in the Company to DINURO.

The terms of the investment are more particularly described in, and the investment is governed by, the attached Reservation and Subscription Agreement and Operating Agreement of the Company. If you would like to subscribe to the Units, then please return a complete and executed Reservation and Subscription Agreement, along with payment of the subscription price, to the Company in accordance with the terms of the Reservation and Subscription Agreement.

**Please note that DINURO must commit to the investment no later than July 9, 2010 at 5:00 p.m. (Miami time), and the payment for the subscription must be received by the Company no later than July 21, 2010 at 5:00 p.m. (Miami time).**

Should you have any questions, or require further information, please do not hesitate to write to the undersigned at the address set forth above.

Sincerely,

MERICI, LLC.

By
Felisberto Camacho, Manager

cc:    Jorge Otero, Esq. (via email, w/enc.)
      Ricardo J. Souto, Esq. (via email, w/enc.)

## SR ACQUISITIONS, LLC
## RESERVATION AND SUBSCRIPTION AGREEMENT

THIS RESERVATION AND SUBSCRIPTION AGREEMENT (the "Agreement"), dated as of July 8, 2010 (the "Closing Date"), is made by and between **SR ACQUISITIONS, LLC**, a Florida limited liability company (the "Company"), and the signatory to this Agreement (the "Subscriber").

### RECITALS:

A.     The ownership interests of the Company are comprised of three hundred (300) units.

B.     The Company is being formed for the purpose of purchasing that certain Loan No. 10171114863 by and between Ocean Bank and San Remo Homes at Florida City, LLC and that certain Loan No. 10154291563 by and between Ocean Bank and San Remo Homes at Homestead, LLC (collectively, the "Loans") from Ocean Bank, and, in this connection, is offering three hundred (300) units in the Company (collectively, the "Offered Units") to Subscriber and certain other persons (collectively, the "Offerees") for an aggregate purchase price of $5,100,000, or $17,000 for each Offered Unit.

C.     The business and affairs of the Company will be described in, and governed by, an Operating Agreement, a copy of which is attached to this Agreement as Exhibit A (the "Operating Agreement"). Capitalized terms used but not defined in this Agreement shall have the meanings assigned to them in the Operating Agreement.

D.     The Subscriber wishes to reserve the right to purchase the Offered Units from the Company and further wishes to subscribe for and purchase the Offered Units from the Company on the Closing Date, subject to the terms and conditions set forth in this Agreement.

E.     The Company wishes to accept the reservation and subscription of the Subscriber and, effective on the Closing Date, the Company wishes to issue the Offered Units to the Subscriber, subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the mutual promises and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the parties hereby agree as follows:

## AGREEMENT:

### SECTION 1

SUBSCRIPTION AND PURCHASE

1.1     Subscription.

The Subscriber hereby subscribes to purchase from the Company, effective as of the Closing Date, the number of Offered Units set forth on Schedule 1 to this Agreement (the "Subscription") for the subscription price set forth on Schedule 1 (the "Subscription Price").

1.2     Payment of Subscription Price.

The Subscriber shall deliver an amount equal to the Subscription Price (the "Payment") to the Company by wire transfer pursuant to wire transfer instructions that the Company will provide upon receipt of a signed counterpart of this Agreement from the Subscriber.

1.3     Acceptance or Rejection of Subscription Offer.

(a)     The reservation and subscription by the Subscriber is irrevocable (subject to Section 2.2(e) below). The Company has the right, in its discretion, to accept or reject the reservation and subscription by the Subscriber to the extent that it exceeds one hundred (100) of the Offered Units (the "Excess Subscription Offer"), in whole or in part. The Company will exercise this right within five (5) days of the delivery of this Agreement and the Payment to the Company. If the Company rejects all or a portion of the Excess Subscription Offer, the Company will promptly return to the Subscriber the portion of the Payment which has been rejected by the Company, without interest or deduction.

(b)     Notwithstanding the provisions of Section 1.3(a), the Company shall have the right to reject the entire reservation and subscription by the Subscriber if it has not received a Subscription and Payment for all of the Offered Units by all of the Offerees in the aggregate.

1.4     Deadline for Subscription.

The Subscriber: (i) must deliver an executed counterpart of this Agreement for receipt by the Company no later than July 9, 2010 at 5:00 pm (Miami time) (the "Subscription Deadline"); and (ii) must deliver the Payment for receipt by the Company no later than July 21, 2010 at 5:00 p.m. (Miami time) (the "Payment Deadline"). If either the signed Agreement or the Payment is not received by the Company, or if received by the Company after the Subscription Deadline or Payment Deadline, respectively, this Agreement shall be of no force and effect.

SECTION 2

REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER

The Subscriber hereby represents and warrants to the Company as follows:

2.1     Power, Authority, Execution, Delivery and Enforceability.

The Subscriber has all of the requisite power and authority to enter into this Agreement, to carry out the provisions hereof, and to acquire and hold the Offered Units to be purchased by the Subscriber.    The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of the terms and provisions hereof will not conflict with any agreement or other instrument to which the Subscriber is bound or any law, rule or regulation applicable to the Subscriber.  This Agreement has been duly executed and delivered by the Subscriber and, when executed and delivered by the Company, will constitute a valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms.

2.2     Securities Act Representations and Warranties.

(a)     The Subscriber acknowledges that the Offered Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws, in reliance on exemptions from such registration for transactions not involving any public offering.  Consequently, such Offered Units may not be sold or otherwise transferred, except in a transaction which is either registered under the Securities Act and applicable state securities laws, or exempt from or not subject to the registration requirements of the Securities Act and applicable state securities laws.

(b)     The Subscriber is subscribing to purchase the Offered Units solely for the Subscriber's own account, for investment, and not with a view to or for the resale, assignment, distribution, subdivision or fractionalization thereof.  The Subscriber agrees not to resell the Offered Units without compliance with the terms of such securities, this Agreement, the Securities Act or any applicable state securities laws.

(c)     The Subscriber is an "Accredited Investor" as that term is defined in Rule 501 under the Securities Act.  In this connection, the Subscriber hereby confirms that the Subscriber falls within one or more of the following categories (please check all boxes that apply):

___ The Subscriber is a natural person whose individual net worth or joint net worth with that person's spouse, at the time of his purchase, exceeds $1,000,000.

___ The Subscriber is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level

in this year.

___ The Subscriber is a director or executive officer of the Company.

___The Subscriber is a corporation, business trust or partnership not formed for the specific purpose of acquiring the Offered Units, with total assets in excess of $5,000,000.

___ The Subscriber is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Offered Units and whose purchase is directed by a sophisticated person.

___ The Subscriber is an entity in which all of the equity owners are Accredited Investors.

(d)     The Subscriber alone, or together with the Subscriber's purchaser representatives, has the requisite knowledge and experience to assess the merits and risks relating to an investment in the Offered Units, and understands the risk of a loss of some or all of the amount which the Subscriber may invest in the Offered Units.  The Subscriber has had an opportunity to ask questions of and receive answers from representatives of the Company concerning the terms of the Offered Units and the financial condition and prospects of the Company, and to obtain any additional information and documents necessary to evaluate an investment in the Company.  All documents, records and other materials pertaining to an investment in the Offered Units, which were requested by the Subscriber, have been made available or delivered to him, her or it.

(e)     THE SUBSCRIBER ACKNOWLEDGES THAT, UNDER SECTION 517.061(11) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, THE SUBSCRIBER HAS THE RIGHT TO VOID AND RESCIND THE SUBSCRIBER'S PURCHASE OF THE OFFERED UNITS PROVIDED THAT THE SUBSCRIBER MUST EXERCISE THIS RIGHT, IF AT ALL, WITHIN THREE (3) DAYS AFTER THE SUBSCRIBER FIRST PAYS THE PURCHASE PRICE OF THE OFFERED UNITS OR WITHIN THREE (3) DAYS AFTER THE DATE ON WHICH THE SUBSCRIBER EXECUTES THIS AGREEMENT, WHICHEVER IS LATER.

SECTION 3

RISK DISCLOSURES

Section 3.1    Risk Factors.

An investment in the Offered Units involves certain risks.  An investment is only suitable for persons of substantial financial means who have no need for liquidity.  The following factors,

along with others described in this Agreement, should be considered in evaluating an investment in the Offered Units.

(a)    The Company is a new limited liability company with no operating history, and the Company might not be able to implement its investment strategy and operating policies successfully. The Company is subject to all of the business risks and uncertainties associated with any new business, including the risk that the Company will not achieve its investment objective. The results of the Company's activities will depend on a variety of factors, including the ability of the Company to implement its plans for realizing value from its investments and economic conditions in the United States and in the markets in which the Company will invest.

(b)    The borrowers under the Loans, San Remo Homes at Florida City, LLC and San Remo Homes at Homestead, LLC (the "Borrowers") are currently in default of their payment obligations under the Loans, which have fully matured. The Company cannot predict whether the Borrowers will continue in default or make any payments with respect to the Loans.

(c)    If the Borrowers' default continues after acquisition of the Loans, the Company may be required to file lawsuits (the "Lawsuits") against the Borrowers and any guarantors of the Loans (the "Guarantors"). The Company is subject to all of the risks and uncertainties associated with litigation, including substantial costs.

(d)    If the Company cannot obtain repayment of the Loans through the Lawsuits, the Company may satisfy all or a portion of the amount owed through a repossession of property owned by the Borrower. In this regard, the Loans are secured by certain real property located in Florida City, Florida, and Homestead, Florida (the "Properties"). The fair market values of the Properties are currently less than the outstanding principal balance due on the Loans. The Company cannot predict with any certainty the future demand for the Properties. Due to the uncertainty of market conditions that may affect the future disposition of the Properties, the Company cannot assure investors that it will be able to sell the Properties at a profit in the future and recover the investment in the Loans.

SECTION 4

OPERATING AGREEMENT

4.1    In General.

The Subscriber acknowledges and agrees that the Company and each of its Members will enter into the Operating Agreement effective as of the Closing Date. The Operating Agreement governs the rights and duties of the members of the Company.

4.2    Signature.

As indicated in Section 4.1 above, the Subscriber hereby acknowledges and agrees that the Subscriber will become a party to, and be bound by the terms of, the Operating Agreement. The effective date of such admission will be the Closing Date. Consequently, and unless the subscription is rejected under Section 1.3(b), effective as of such date, the Subscriber will be

admitted as a Member of the Company. The Subscriber hereby authorizes the Manager of the Company to: (i) complete Exhibit A to the Operating Agreement in accordance with the provisions of this Agreement and all other Reservation and Subscription Agreements; (ii) execute a counterpart of the Operating Agreement on behalf of Subscriber; and (iii) deliver an executed counterpart to the Company simultaneously with the execution of this Agreement.

SECTION 5

MISCELLANEOUS

5.1     Assignability.

This Agreement and the rights and obligations of the Subscriber under this Agreement shall not be assignable or transferable by the Subscriber without the prior written consent of the Company. Any instrument purporting to make an assignment in violation of this Section 5.1 shall be void. All covenants, agreements, representations, warranties and undertakings in this Agreement made by and on behalf of any party shall bind and inure to the benefit of the successors and permitted assigns of such party.

5.2     Costs and Expenses of the Parties.

All costs and expenses incurred by each party in connection with the negotiation and consummation of this Agreement and the transactions contemplated hereby shall be borne by the party so incurring such expenses (except that the parties acknowledge and agree that the Payment and the Subscription Price may be used to cover costs and expenses of the Company).

5.3     Severability.

If any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired. In the case of any such invalidity, illegality or unenforceability, the parties agree to use their commercially reasonable efforts to achieve the purpose of such provision by a new legally valid and enforceable stipulation.

5.4     GOVERNING LAW.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT WOULD GIVE EFFECT TO THE LAWS OF ANOTHER JURISDICTION.

5.5     Arbitration.

Any dispute, controversy or question of interpretation arising under, out of, in connection with or in relation to this Agreement or any amendments hereof, or any breach or default hereunder, shall be submitted to, and determined and settled by, arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The place of

arbitration shall be Miami, Florida, and the language to be used in the arbitral proceedings shall be English. Any award rendered in such proceedings shall be final and binding on the parties thereto, and judgment may be entered thereon in any court having jurisdiction thereof subject to Section 5.6 hereof. Each of the parties hereby irrevocably submits to the jurisdiction of any arbitration panel sitting in Miami, Florida. Each party hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of any arbitration in Miami, Florida.

   5.6    Consent to Jurisdiction.

   Each party hereby irrevocably and unconditionally submits to the jurisdiction of the United States District Court for the Southern District of Florida, or if such court does not have jurisdiction, the appropriate state court sitting in Miami-Dade County, Florida and irrevocably agrees that all actions or proceedings arising out of or relating to this Agreement or the transactions contemplated hereby may be litigated in such court. Each party irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any such proceeding in any such court and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each party consents to process being served on such party in any such action or proceeding by a copy thereof being mailed by registered or certified mail to such party at the address set forth in Section 5.7 and that service shall be deemed to be completed upon the earlier of actual receipt and five (5) business days after such copy shall have been posted to such address. Each party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing contained in this Section 5.6 shall affect the right of any party to serve legal process in any other manner permitted by law.

   5.7    Notices.

   All notices, requests and other communications to any party hereunder shall be in writing and sufficient if delivered by hand, by registered and certified mail (postage prepaid with return receipt requested) or by overnight courier service, in each case addressed as follows:

|  |  |
|---|---|
| If to the Company: | SR ACQUISITIONS, LLC<br>1500 Miami Center<br>201 South Biscayne Boulevard<br>Miami, Florida 33131<br>Attention: Ricardo J. Souto, Esq. |
| If to the Subscriber: | See Schedule 1 |

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith. Each such notice, request or communication shall be effective when so delivered by hand, on the fifth (5th) day following the date on which such communication is sent when delivered by registered and certified mail and on the first

business day following the date on which such communication is sent when delivered by overnight courier service.

### 5.8    Amendment or Waiver.

Except as expressly stated herein, neither this Agreement nor any terms hereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by all of the parties or, in the case of a waiver, by the party waiving compliance.

### 5.9    Headings Descriptive.

The headings of the Sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

### 5.10    Nouns and Pronouns.

Whenever the context requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice-versa.

### 5.11    Equitable Relief.

Each party acknowledges and agrees that any violation by it of any provision contained in this Agreement shall cause the other parties irreparable injury not fully compensable by monetary damages and for which the non-breaching party may not have an adequate remedy at law. Accordingly, if any party institutes an action or proceeding to enforce this Agreement, then such non-breaching party shall be entitled to injunctive or other equitable relief as may be necessary or appropriate to enjoin, prevent or curtail any breach of this Agreement, threatened or actual, without the posting of any bond or security. The foregoing shall be in addition to and without prejudice to such other rights as the non-breaching party may have under this Agreement, at law or in equity.

### 5.12    Entire Agreement.

This Agreement constitutes the entire and only agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, commitments or understandings, whether written or verbal, that the parties hereto may have had with respect to the subject matter hereof, including any drafts of a term sheet relating to the transactions contemplated hereby.

### 5.13    Counterparts.

This Agreement may be executed in any number of counterparts and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall be deemed effective upon the delivery of original counterparts of the fully executed Agreement, or copies thereof, to the parties in accordance with Section 5.7 hereof.

5.14    Confidentiality.

Except as may be authorized in advance in writing by the Company, the Subscriber agrees to keep confidential, and not to disclose, the terms and conditions of this Agreement, the Operating Agreement, and/or any other matter relating to such documents.

5.15    WAIVER OF JURY TRIAL.

THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY DOCUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES' ACCEPTANCE OF THIS AGREEMENT.

*(Remainder of Page Left Blank Intentionally.)*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed and delivered as of the day and year first above written.

SR ACQUISITIONS, LLC, a Florida limited liability company

By: _____
Name: _____
Title: _____

SUBSCRIBER:

DINURO INVESTMENT, LLC

By: _____
Name: _____
Title: _____

The undersigned, as principal(s) of the Subscriber, agree to be bound by the provisions of Sections 4.5, 10.3 and 15.21 of the Operating Agreement, and hereby authorize the Manager of the Company to execute a counterpart of the Operating Agreement on his or her behalf.

_____
Marco Romagnoli

_____
Roberto Romagnoli

Schedule 1 to Subscription Agreement
SR ACQUISITIONS, LLC

NAME AND ADDRESS OF SUBSCRIBER:

SUBSCRIBER:

DINURO INVESTMENT, LLC

Address:

_____

_____

_____
(Social Security Number or Tax Identification Number)

AMOUNT OF SUBSCRIPTION PRICE:

Number of Offered Units:              _____

Price per Offered Units:          $_____

Total Subscription Price:          $_____

ACCEPTANCE OF SUBSCRIPTION:

The Company hereby accepts the Subscription of the Subscriber set forth in this Agreement for _____ Offered Units, or a total of $_____, the transfer of which shall be consummated and shall become effective as of the Closing Date.

SR ACQUISITIONS, LLC

By: _____
Name: _____
Its: _____

<u>Exhibit A to Subscription Agreement</u>
<u>SR ACQUISITIONS, LLC</u>
<u>Operating Agreement</u>

# OPERATING AGREEMENT

## OF

## SR ACQUISITIONS, LLC

Dated as of July 8, 2010

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| SECTION 1 | DEFINITIONS, INTERPRETATION | 1 |
| 1.1. | Definitions | 1 |
| 1.2. | Accounting Terms and Determinations | 5 |
| 1.3. | Interpretation | 5 |
| 1.4. | Managers' Standard of Care | 6 |
| SECTION 2 | ORGANIZATION | 6 |
| 2.1. | Term | 6 |
| 2.2. | Name | 6 |
| 2.3. | Purpose | 6 |
| 2.4. | Places of Business | 6 |
| 2.5. | Registered Office and Agent | 7 |
| 2.6. | Fiscal Year | 7 |
| 2.7. | Powers | 7 |
| 2.8. | Organizational Certificates and Other Filings | 8 |
| SECTION 3 | MEMBERS | 8 |
| 3.1. | In General | 8 |
| 3.2. | Liability of Managers and Related Persons | 8 |
| 3.3. | Limited Liability of Members | 9 |
| 3.4. | Right to Hold Units as Non-Voting Units | 9 |
| 3.5. | No Priority, Etc | 10 |
| 3.6. | Company Property; Company Units | 10 |
| SECTION 4 | CAPITAL CONTRIBUTIONS; CAPITAL COMMITMENTS | 10 |
| 4.1. | Initial Capital Contributions and Required Additional Contributions | 10 |
| 4.2. | Additional Capital Contributions | 10 |
| 4.3. | Additional Members | 12 |
| 4.4. | Units | 12 |
| 4.5. | Member Guaranty | 13 |
| SECTION 5 | CAPITAL ACCOUNTS, ALLOCATIONS | 13 |
| 5.1. | Capital Accounts | 13 |
| 5.2. | Allocations to Capital Accounts | 13 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 5.3. | Tax Allocations | 15 |
| 5.4. | Determinations by Managers | 15 |
| SECTION 6 | DISTRIBUTIONS | 16 |
| 6.1. | No Right to Withdraw | 16 |
| 6.2. | Ordinary Distributions | 16 |
| 6.3. | Distributions in Kind | 17 |
| 6.4. | Restrictions on Distributions | 17 |
| 6.5. | Withholding | 18 |
| 6.6. | Record Holders | 18 |
| 6.7. | Final Distribution | 18 |
| SECTION 7 | MANAGEMENT | 18 |
| 7.1. | Management by Members | 18 |
| 7.2. | General Powers of the Managers | 19 |
| 7.3. | Limitations on the Managers | 19 |
| 7.4. | Third Party Reliance | 19 |
| 7.5. | Designation of Tax Matters Partner | 19 |
| 7.6. | Other Activities of the Managers and Related Persons | 20 |
| 7.7. | Conflicts of Interest | 20 |
| 7.8. | Member Consent | 20 |
| SECTION 8 | COMPANY EXPENSES | 20 |
| 8.1. | Company Expenses | 20 |
| 8.2. | Member's Expenses | 21 |
| 8.3. | Advances to Cover Company Expenses | 21 |
| SECTION 9 | BOOKS OF ACCOUNT, RECORDS AND BANKING | 21 |
| 9.1. | Maintenance of Books and Records. Etc | 21 |
| 9.2. | Tax Information | 22 |
| 9.3. | Annual Financial Statements and Other Reports | 22 |
| SECTION 10 | TRANSFER OF UNITS; SUBSTITUTE MEMBERS | 23 |
| 10.1. | Assignments and Withdrawals by Members | 23 |
| 10.2. | Member's Right of First Refusal | 23 |

# TABLE OF CONTENTS
(continued)

Page

10.3.   Indirect Transfers .......................................................................................... 24

SECTION 11        INDEMNIFICATION OF MANAGERS ....................................... 24

11.1.   Indemnification ............................................................................................. 24

11.2.   Not Liable for Return of Capital .................................................................. 25

SECTION 12        DURATION AND TERMINATION OF THE COMPANY ......................... 25

12.1.   Event of Termination .................................................................................... 25

12.2.   Winding-Up .................................................................................................. 25

12.3.   Distributions in Cash or in Kind on a Winding Up ..................................... 26

12.4.   Time for Liquidation ..................................................................................... 27

12.5.   Termination .................................................................................................. 27

SECTION 13        DISSOLUTION, ETC. OF MEMBERS ......................................... 27

SECTION 14        AMENDMENTS ........................................................................... 27

14.1.   Amendments Requiring Consent of Members.............................................. 27

14.2.   Amendments by Managers ........................................................................... 28

SECTION 15        MISCELLANEOUS ...................................................................... 28

15.1.   Waiver of Partition........................................................................................ 28

15.2.   Entire Agreement .......................................................................................... 28

15.3.   Choice of Law............................................................................................... 28

15.4.   Successors and Assigns................................................................................. 29

15.5.   Severability ................................................................................................... 29

15.6.   Counterparts.................................................................................................. 29

15.7.   Additional Documents .................................................................................. 29

15.8.   Non-Waiver................................................................................................... 29

15.9.   Manner of Consent........................................................................................ 29

15.10.  Notices .......................................................................................................... 30

15.11.  Grant of Power of Attorney .......................................................................... 30

15.12.  Irrevocable and Coupled with an Interest; Copies to Be Transmitted ................. 31

15.13.  Survival of Power of Attorney...................................................................... 31

15.14.  Limitation of Power of Attorney.................................................................. 31

15.15.  Voting Rights; Meetings ............................................................................... 31

# TABLE OF CONTENTS
(continued)

**Page**

15.16. Submission to Jurisdiction ........................................................................ 32

15.17. Entity Classification ................................................................................. 32

15.18. Survival .................................................................................................... 32

15.19. Waiver of Trial by Jury ............................................................................ 32

15.20. Representation of Shutts & Bowen LLP ................................................... 32

15.21. GENERAL RELEASE .............................................................................. 33

This **OPERATING AGREEMENT** of **SR ACQUISITIONS, LLC, a Florida limited liability company** (the "Company"), is made as of the 8th day of July, 2010 (the "Effective Date"), by and among the Persons listed on Exhibit A to this Agreement (the "Members").

RECITALS

A.     The Company was formed on July __, 2010 pursuant to Articles of Organization which were executed by the Authorized Representative and filed for recordation in the office of the Secretary of State of the State of Florida on July __, 2010.

B.     The parties desire to enter into this Operating Agreement of the Company to set forth the rights and duties of the Managers and the Members.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth in this Operating Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

**AGREEMENT:**

SECTION 1

DEFINITIONS, INTERPRETATION

1.1.    Definitions.

As used in this Agreement, the following terms shall have the following respective meanings:

"Act" shall mean the Florida Limited Liability Company Act.

"Additional Member" has the meaning set forth in Section 4.3.

"Advances" has the meaning set forth in Section 8.3.

"Advisers Act" means the Investment Advisers Act of 1940, as the same may be hereafter amended from time to time.

"Affiliate" means, with respect to any Person, any other Person of which such Person is a member, director, officer, manager, or employee or any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person.

"Agreement" means this Operating Agreement, as amended from time to time.

"Applicable Law" means any applicable law, regulation, ruling, order or directive, or license, permit or other similar approval of any Governmental Authority, now or hereafter in effect, to which a Member (or any of its Affiliates) is or may be subject.

"Assignment" has the meaning set forth in Section 10.1.

"Authorized Representative" shall mean Ricardo J. Souto.

"Book Value" means, with respect to any Company asset, the asset's adjusted basis for federal income tax purposes, except that the Book Values of all Company assets shall be adjusted to equal their respective Fair Market Values, in accordance with the rules set forth in Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, except as otherwise provided herein, immediately prior to: (a) the date of the acquisition of any additional Units by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the date of the actual distribution of more than a de minimis amount of Company property (other than a pro rata distribution) to a Member; or (c) the date of the actual liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations; provided that adjustments pursuant to clauses (a) and (b) above shall be made only if the Managers determine in their sole discretion that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Book Value of any Company asset distributed to any Member shall be adjusted immediately prior to such distribution to equal its Fair Market Value. The Book Value of any Company asset shall be adjusted to reflect any write-down which constitutes a Disposition.

"Business Day" means any day excluding a Saturday, a Sunday and any other day on which banks are required or authorized to close in Miami, Florida.

"Capital Account" has the meaning set forth in Section 5.1.

"Capital Contribution" means a contribution to the capital of the Company made pursuant to Section 4.

"Code" means the Internal Revenue Code of 1986, as the same may be hereafter amended from time to time.

"Company" has the meaning set forth in the introduction to this Agreement.

"Company Act" means the Florida Limited Liability Company Act, as amended from time to time.

"Company Expenses" has the meaning set forth in Section 8.1.

"Damages" means any and all damages, disbursements, suits, claims, liabilities, obligations, judgments, fines, penalties, charges, amounts paid in settlement, expenses, costs and expenses (including, without limitation, attorneys' fees and expenses) arising out of or related to litigation and interest on any of the foregoing.

"Default Rate" means the lesser of (a) the Prime Rate plus five percent (5%) per annum and (b) the maximum rate permitted by law.

"Disabling Event" has the meaning set forth in Section 13.

"Disposition" means the sale, exchange, redemption, assignment, transfer, repayment, financing, re-financing or other disposition by the Company of all or any portion of the Loan or

any other Company asset for cash which can be distributed to the Members pursuant to Section 6 and shall include a distribution in kind to the Members of all or any portion of the Loan as permitted hereby.

"Effective Date" has the meaning set forth in the introduction to this Agreement.

"Event of Termination" has the meaning set forth in Section 12.1.

"Fair Market Value" means as to any property on any date, the fair market value of such property on such date as determined in good faith by the Managers, provided that if a Majority-in-Interest so requests in writing, the fair market value of such property shall be determined by an independent, recognized investment banking firm, an independent, nationally recognized accounting firm or an independent, recognized appraisal firm selected by the Managers.

"Final Distribution" means the distribution described in Sections 6.7 and 12.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any other Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Internal Revenue Service" means the United States Internal Revenue Service or its successor.

"Liquidation Representative" has the meaning set forth in Section 12.2.

"Loans" means Loan No. 10171114863 by and between Ocean Bank and San Remo Homes at Florida City, LLC with a principal balance outstanding of approximately $3,633,750 as of the Effective Date and Loan No. 10154291563 by and between Ocean Bank and San Remo Homes at Homestead, LLC, with a principal balance outstanding of approximately $872,100 as of the Effective Date.

"Majority-in-Interest" means, with respect to any action or decision, one or more Members which own, in the aggregate, more than fifty percent (50%) of the Percentage Interests of all Members entitled to vote with respect to such action or decision.

"Manager(s)" or "Managing Member(s)" means the Members who are authorized to manage the day-to-day operations of the Company in accordance with Section 7.1 and their replacements or successors.

"Members" means the persons identified in Exhibit A to this Agreement and such substituted or additional Members as shall be admitted to the Company pursuant to Sections 4, 10 or 13.

"Net Cash Flow from Operations" shall mean, for any fiscal period, the gross cash receipts from Company operations, (excluding receipts from loans or Capital Contributions) less the portion thereof used to pay, or establish reserves for, all Company expenses, debt service payments, capital improvements, replacements and contingencies, all as determined by the Managers. Net Cash Flow From Operations shall not be reduced by depreciation, amortization,

cost recovery deductions or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

"Net Cash from Sales or Refinancing" shall mean the net cash receipts from the sales and other dispositions and the financing or refinancing of all or substantially all of the assets of the Company (including the Loans). All of the Net Cash From Sales or Refinancing shall be distributed to the Members as set forth in Section 12.2, unless the Members shall unanimously agree in writing to establish or increase reserves for contingent liabilities. Net Cash From Sales or Refinancing shall be increased by any reduction of reserves established pursuant to the preceding sentence. Net Cash From Sales or Refinancing shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with a sale or other disposition of all or substantially all of the assets of the Company (including the Loans).

"Net Income" and "Net Loss" means, for each Fiscal Year or other period, the taxable income or loss of the Company, or particular items thereof, determined in accordance with the accounting method used by the Company for federal income tax purposes with the following adjustments: (a) all items of income, gain, loss, deduction or expense specially allocated pursuant to this Agreement (including Sections 5.2 and 5.3) shall not be taken into account in computing such taxable income or loss; (b) any income of the Company that is exempt from federal income taxation and not otherwise taken into account in computing Net Income and Net Loss shall be added to such taxable income or loss; (c) if the Book Value of any asset differs from its adjusted tax basis for federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Book Value; (d) upon an adjustment to the Book Value of any asset pursuant to the definition of Book Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; (e) if the Book Value of any asset differs from its adjusted tax basis for federal income tax purposes the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Net Income and Net Loss shall be an amount which bears the same ratio to such Book Value as the federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided that if the federal income tax depreciation, amortization or other cost recovery deduction is zero, the Managers may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Income and Net Loss); and (f) except for items in (a) above, any expenditures of the Company not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Net Income and Net Loss pursuant to this definition, shall be treated as deductible items.

"Organizational Expenses" means all costs and expenses of the Company relating to the organization of the Company.

"Percentage Interest" means, with respect to any Member, the ratio of such Member's Units to the total Units of all Members, as adjusted from time to time.

"Person" means an individual, limited liability company, partnership (including limited and limited liability partnerships), corporation, trust or unincorporated organization, and a government or agency or political subdivision thereof.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Citibank, N.A. (or any successor thereto) as its prime or base rate in effect at its principal office in New York City. The Prime Rate is not intended to be the lowest rate of interest charged by such bank in connection with extensions of credit to debtors.

"Related Person" has the meaning set forth in Section 3.2.

"Schedule K-1" means the Internal Revenue Service Schedule K-1, Partner's Share of Income, Deductions, Credits, etc.

"Substitute Member" means a Member who is admitted as a Substitute Member in accordance with the provisions of Section 10.1.

"Tax Matters Member" has the meaning set forth in Section 7.5.

"Treasury Regulations" means the Income Tax Regulations promulgated under the Code, as the same may be hereafter amended from time to time.

"Unit" means the ownership interest of the Members in the Company, as further defined in Section 4.4 of this Agreement.

"U.S. Dollars" and "US$" means lawful money of the United States of America.

1.2.   Accounting Terms and Determinations.

All accounting terms used in this Agreement and not otherwise defined shall have the meaning accorded to them in accordance with the method of accounting selected by the Managers, in their sole and absolute discretion, consistently applied.

1.3.   Interpretation.

(a)   Schedules, Exhibits, Sections. References to a "Schedule" or an "Exhibit" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement and references to a "Section" or a "subsection" are, unless otherwise specified, to a Section or a subsection of this Agreement.

(b)   Plural. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or neuter gender shall include the masculine, the feminine and the neuter.

(c)   Captions. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

(d)   Other. The parties hereto acknowledge that each party and its counsel have reviewed this Agreement and that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto. For purposes of this Agreement: "herein",

"hereby", "hereof", "hereunder", "herewith", "hereafter" and "hereinafter" refer to this Agreement in its entirety, and not to any particular subsection or paragraph. References to "including" means including without limiting the generality of any description preceding such term.

### 1.4.   Managers' Standard of Care.

Whenever in this Agreement the Managers are permitted or required to make a decision (a) in their "sole and absolute discretion," "sole discretion," "discretion" or under a grant of similar authority or latitude, the Managers shall be entitled to consider such interests and factors as they desire, including their own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (b) in their "good faith" or under another express standard, the Managers shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or other applicable law.

## SECTION 2

## ORGANIZATION

### 2.1.   Term.

The term of the Company commenced on the date the Articles of Organization of the Company were filed with the Secretary of State of the State of Florida and shall continue indefinitely, unless sooner dissolved pursuant to Section 12.

### 2.2.   Name.

The name of the Company shall be "SR ACQUISITIONS, LLC" or such other name or names as may be selected by the Managers from time to time, and its business shall be carried on in such name with such variations and changes as the Managers deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.   The Managers shall give the Members prompt written notice of any change in the name of the Company.

### 2.3.   Purpose.

The Company is organized primarily for the object and purpose of: (a) acquiring the Loans from Ocean Bank; (b) engaging in such additional acts and activities and conducting such other businesses related or incidental to the foregoing as the Managers shall reasonably deem necessary or advisable; and (c) engaging in such other business and activities permitted under the Act to be carried out by limited liability companies.

### 2.4.   Places of Business.

The Company shall have its principal place of business at 13054 SW 133rd Court, Miami, Florida 33186, or at such other place or places as the Managers may, from time to time, select.

The Company may from time to time have such other place or places of business in such other jurisdictions as the Managers may deem advisable.

2.5.    Registered Office and Agent.

The address of the Company's registered office in the State of Florida is 201 South Biscayne Boulevard, Suite 1500 (R1S), Miami, Florida 33131. The name of the registered agent at the address is Corporation Company of Miami.

2.6.    Fiscal Year.

The fiscal year of the Company (the "Fiscal Year") shall end on the 31st day of December in each year. The Managers shall have the authority to change the ending date of the Fiscal Year to any other date required or allowed under the Code if the Managers, in their sole discretion, shall determine such change to be necessary or appropriate. The Managers shall promptly give notice of any such change to the Members.

2.7.    Powers.

Subject to the provisions of Sections 7 and 14, the Company, and the Managers acting on behalf of the Company, shall be empowered to do or cause to be done, or not to do, any and all acts deemed by the Managers in their sole discretion to be necessary or appropriate in furtherance of the purposes of the Company including, without limitation, the power and authority to:

(a)    open, have, maintain and close bank accounts, including the power to draw checks or other orders for the payment of moneys;

(b)    bring and defend actions and proceedings at law or in equity or before any governmental, administrative or other regulatory agency, body or commission;

(c)    hire consultants, custodians, attorneys, accountants and such other agents and employees of the Company as they may deem necessary or advisable, and to authorize each such agent and employee to act for and on behalf of the Company;

(d)    make all elections, investigations, evaluations and decisions, binding the Company thereby, that may, in the sole judgment of the Managers be necessary or appropriate for the acquisition, holding or disposition of the Loan;

(e)    enter into, perform and carry out contracts and agreements of every kind necessary or incidental to the acquisition, ownership, sale or other disposition of the Loan, and to take or omit to take such other action as may be necessary or desirable to further the purposes of the Company; and

(f)    carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the Company's business.

2.8. <u>Organizational Certificates and Other Filings</u>.

(a) <u>Authority</u>. The Members hereby acknowledge, approve and ratify the filing of the Articles of Organization by the Authorized Representative, whose appointment is limited to the filing of the Articles of Organization, and hereby authorize the Managers to execute or cause to be executed all other instruments, certificates, notices and documents, and to do or cause to be done all such filing, recording, publishing and other acts as may be deemed by the Managers in their sole discretion to be necessary or appropriate from time to time to comply with all applicable requirements for the formation or operation or, when appropriate, termination of a limited liability company in the State of Florida and all other jurisdictions where the Company does or shall desire to conduct its business.

(b) <u>Further Assurances</u>. If requested by the Managers, the Members shall immediately execute all certificates and other documents consistent with the terms of this Agreement necessary for the Managers to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for: (i) the formation and operation of a limited liability company under the laws of the State of Florida and (ii) all other filings required to be made by the Company.

SECTION 3

MEMBERS

3.1. <u>In General</u>.

The Company shall consist initially of the Member's identified in <u>Exhibit A</u> to this Agreement and such additional and substituted Members as may be admitted to the Company pursuant to Sections 4, 10 or 13. The Managers shall cause <u>Exhibit A</u> to be amended from time to time to reflect the admission of any Member, the removal or withdrawal of any Member for any reason or the receipt by the Company of notice of any change of name of a Member.

3.2. <u>Liability of Managers and Related Persons</u>.

(a) <u>General</u>. None of the Managers, their Affiliates, any officer, director, stockholder, member, partner, employee, or agent of the Managers, or any of their respective Affiliates or any Person who was, at the time of the act or omission in question, such a Person (collectively, the "<u>Related Persons</u>"), shall be liable, responsible or accountable, whether directly or indirectly, in contract or tort or otherwise, to the Company, any other Person in which the Company has a direct or indirect interest or any Member (or any Affiliate thereof) for any Damages asserted against, suffered or incurred by the Company, any other Person in which the Company has a direct or indirect interest or any Member (or any of their Affiliates) arising out of, relating to or in connection with any act or failure to act pursuant to this Agreement or otherwise with respect to:

(i) the management or conduct of the business and affairs of the Company, any other Person in which the Company has a direct or indirect interest or any of their respective Affiliates (including, without limitation, actions taken or not taken by any Related

Person as a director of any Person in which the Company has a direct or indirect interest or any Affiliates of such Person); and

(ii)     the offer and sale of Units in the Company:

except, in each case, Damages resulting from acts or omissions of such Related Person which were taken or omitted in bad faith or constituted gross negligence, intentional misconduct, a breach of this Agreement or a knowing violation of law.

(b)     Employees and Agents. Notwithstanding the foregoing provisions of this Section 3.2, no Related Person shall be liable to the Company, any other Person in which the Company has a direct or indirect interest or any Member (or any Affiliate thereof) for any action taken or omitted to be taken by any other Related Person.

(c)     Reliance on Third Parties. Any Related Person may (in its own name or in the name of the Company) consult with counsel, accountants and other professional advisors in respect of the affairs of the Company and any other Person in which the Company has a direct or indirect interest, and each Related Person shall be deemed not to have acted in bad faith or with gross negligence or to have breached this Agreement or engaged in intentional misconduct with respect to any action or failure to act and shall be fully protected and justified in so acting or failing to act, if such action or failure to act is in accordance with the advice or opinion of such counsel, accountants or other professional advisors, except for actions or failures to act by such Related Person which constitute a knowing violation of law.

(d)     Reliance on this Agreement.  To the extent that, at law or in equity, the Managers have duties (including fiduciary duties) and liabilities relating thereto to the Company or to a Member, the Managers acting under this Agreement shall not be liable to the Company or to any such Member for their good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of the Managers otherwise existing at law or in equity, are agreed by the Members to modify to that extent such other duties and liabilities of the Managers.

3.3.     Limited Liability of Members.

The liability of each Member is limited to its obligation to make Capital Contributions to the Company in amounts from time to time provided by this Agreement, which obligations are intended to be enforceable only by the Company, the Members and the Managers, but not by creditors of the Company, and nothing elsewhere set forth in this Agreement or in any other document, and nothing arising from any other transaction whatsoever between or among any or all of the Members or the Company, shall have the effect of removing, diminishing or otherwise affecting such limitation.

3.4.     Right to Hold Units as Non-Voting Units.

Any Member may, upon notice to the Managers, elect to hold all or any fraction of such Member's Units as non-voting Units, in which case such Member shall not be entitled to participate in any consent of the Members with respect to the portion of its Units which are held as non-voting Units (and such non-voting Units shall not be counted in determining the giving or

withholding of any such consent). Except as provided in this Section 3.4, Units held as non-voting Units shall be identical in all regards to all other Units held by Members. Any such election shall be irrevocable and shall bind the assignees of such Units.

3.5.     No Priority, Etc.

No Member shall have priority over any other Member either as to the return of the amount of its Capital Contribution to the Company or, other than as provided in Section 5, as to any allocation of Net Profit and Net Loss.

3.6.     Company Property; Company Units.

No property of the Company shall be deemed to be owned by any Member individually, but shall be owned by and title shall be vested solely in the Company.   The Units of the Company shall constitute personal property.

SECTION 4

CAPITAL CONTRIBUTIONS; CAPITAL COMMITMENTS

4.1.     Initial Capital Contributions and Required Additional Contributions.

Each Member will make an initial Capital Contribution (the "Initial Contribution") to the Company in the amount set forth opposite such Member's name on Exhibit A hereto, in accordance with the terms of that certain Reservation and Subscription Agreement entered into by and between such Member and the Company.

4.2.     Additional Capital Contributions.

(a)     Except as otherwise provided for in this Section 4, no Member shall be required or permitted to: (i) make any Capital Contributions to the Company in excess of the Initial Contribution set forth in Section 4.1 (an "Additional Capital Contribution"); (ii) make any loan or advance to the Company; or (iii) cause to be loaned any money or other assets to the Company, nor shall the Company be required under this Agreement to accept any loans or advances offered by any Member.

(b)     If, after utilizing the proceeds from the Initial Contribution, the Company requires additional funds for any reason, the Managers, in their sole discretion, or upon request of a Majority-in-Interest, shall deliver to the Members written notice of the Company's need for an Additional Capital Contribution (the "Capital Call Notice") and offer the issuance of additional Units to the Member(s) in exchange for such contribution.

(i)     The Capital Call Notice shall specify: (A) in reasonable detail, the purpose for such Additional Capital Contribution; (B) the aggregate amount of such Additional Capital Contribution; (C) each Member's share of the aggregate amount of such Additional Capital Contribution, which shall be pro rata based upon each such Member's proportionate ownership of Units; (D) the number of Units that will be issued

to each Member in exchange for its Additional Capital Contribution; and (E) the price per Unit (the "Unit Price").

(ii)     The "Unit Price" of the Units described in the Capital Call Notice will be an amount determined to be the fair market value of such Units by an independent appraiser retained by the Company at the Company's expense, computed without a minority discount or a discount for lack of marketability. If any Member (the "Affected Member") disagrees with the Unit Price as determined by the Company's appraiser, the Affected Member may, within five (5) days from the issuance of the Capital Call Notice, and at such Affected Member's expense, retain its own appraiser and submit such appraiser's calculation of the Unit Price to the Company. If the Affected Member's appraiser computes a Unit Price which is within five percent (5%), plus or minus, of the Unit Price computed by the Company's appraiser, the Company's appraisal will be used to compute the Unit Price. If the Affected Member's appraiser computes a Unit Price which is not within five percent (5%) of the appraisal done by the Company's appraiser, then the two appraisers will select a third appraiser, at the joint expense of the Company and the Affected Member, who will calculate the Unit Price of the Company. If the third appraisal is within five percent (5%) of either of the prior two appraisals, then third appraisal will be used as the Unit Price. If the third appraisal is not within five percent (5%) of either of the prior two appraisals, then the Unit Price will be the average of the three appraisals.

(c)     If at any time any Member shall fail to timely make all or any portion of any Additional Capital Contribution requested under Section 4.2(b), and such failure shall continue for a period of ten (10) Business Days after written notice from any other Member, the Member failing to make all or any portion of such Additional Capital Contribution shall be deemed to be a "Non-Contributing Member" hereunder (the amount of such unpaid Additional Capital Contributions shall be referred to as the "Non-Contribution Amount") and the following procedures shall apply. Any Member other than the Non-Contributing Member (a "Contributing Member") may elect to make a Contribution Loan under Section 4.2(c)(i), or may elect to make a Cram-Down Contribution under Section 4.2(c)(ii).

(i)     If a Contributing Member elects to make a Contribution Loan under this Section 4.2(c)(i), such Contributing Member may loan to the Non-Contributing Member a portion of the Non-Contribution Amount equal to the product of (A) the Non-Contribution Amount and (B) the percentage that such Contributing Member's Units bears to the Units owned by all Contributing Members, or such other amount as may be agreed to by all of the Contributing Members, by contributing to the Company on its behalf, all or any part of the Non-Contribution Amount which the Non-Contributing Member failed to contribute to the Company (each such loan, a "Contribution Loan"), provided that such Contributing Member shall have contributed to the Company its pro rata share of the applicable Additional Capital Contribution, and such Contribution Loan shall be treated as an Additional Capital Contribution by the Non-Contributing Member. Each Contribution Loan shall bear interest (compounded monthly on the first day of each calendar month) on the unpaid principal amount thereof from time to time remaining from the date advanced until repaid, at the Default Rate. Contribution Loans will be repaid out of the distributions which would otherwise be made to the Non-Contributing Member under this Agreement and shall be applied: first, to accrued but unpaid

interest; and second, to the principal of the Contribution Loan. Upon the repayment in full of all Contribution Loans made in respect of a Non-Contributing Member (and so long as the Non-Contributing Member is not otherwise a Non-Contributing Member), such Non-Contributing Member will cease to be a Non-Contributing Member.

(ii)     If a Contributing Member elects to make a Cram-Down Contribution under this Section 4.2(c)(ii), such Contributing Member may make an Additional Capital Contribution in respect of all or any part of the Non-Contribution Amount which the Non-Contributing Member failed to contribute to the Company (each, a "Cram-Down Contribution"), and the Contributing Member shall be issued Units in an amount equal to the amount of the Cram-Down Contribution, divided by the Unit Price. In addition, at any time after the making of the Contribution Loan by a Contributing Member (but before such Contribution Loan is repaid), at the option of such Contributing Member: (i) such Contribution Loan shall be converted into an Additional Capital Contribution of the Contributing Member in an amount equal to the unpaid principal and unpaid interest on such Contribution Loan pursuant to this Section 4.2(c); (ii) the Non-Contributing Member shall be deemed to have received a distribution, pursuant to Section 6, of an amount equal to the unpaid principal and unpaid interest on such Contribution Loan; (iii) such distribution shall be deemed paid to the Contributing Member in repayment of the Contribution Loan; (iv) such amount shall be deemed contributed by the Contributing Member as a Cram-Down Contribution; and (v) the Contributing Member shall be issued Units in an amount equal to the unpaid principal and unpaid interest on such Contribution Loan, divided by the Unit Price. A Cram-Down Contribution shall be deemed an Additional Capital Contribution by the Contributing Member making (or deemed making) such Cram-Down Contribution as of the date such Cram-Down Contribution is made or the date on which such Contribution Loan is converted into a Cram-Down Contribution.

(d)     The voting rights of a Member (as a Member and as a Managing Member) shall be suspended during the period that such Member is deemed to be a Non-Contributing Member.

### 4.3.   Additional Members.

The Company may admit additional Members to the Company ("Additional Members") and issue Units to such Additional Members in exchange for Capital Contributions, only with the consent of, and subject to the terms approved by, all of the Members. Upon the admission of one or more Additional Members, the Members shall add the name, address, contribution and such Member's ownership of Units to Exhibit A hereto. Before any Person is admitted to the Company as an Additional Member, and before such a Person may claim any rights to any benefits pursuant to this Agreement, that Person shall agree in writing to be bound by all of the provisions of this Agreement.

### 4.4.   Units.

Each Member's undivided interest in the Company, including its profits, losses and distributions, shall be represented by Units. The Units shall initially be allocated between the initial Members as set forth in Exhibit A hereto.

4.5.   Member Guaranty.

In the event that a Member or a principal of a Member (sometimes referred to in this Section 4.5 as a "Guarantor") is required to personally guarantee any debt, obligations or liability of the Company, each Member and the principal of such Member (the "Principal") shall bear the portion of such debt, obligation or liability that corresponds to such Member's proportionate ownership of Units. In the event that a personal guarantee of a debt, obligation or liability is satisfied by any Guarantor in an amount that exceeds such Guarantor's proportionate ownership (direct or indirect) of the total Units of the Company, the other Member(s) and Principal(s) shall indemnify and agree to hold harmless such Guarantor from and against any loss, expense or damage suffered by such Guarantor to the extent of such excess.

SECTION 5

CAPITAL ACCOUNTS, ALLOCATIONS

5.1.   Capital Accounts.

A capital account (a "Capital Account") shall be established and maintained for each Member to which shall be credited the Capital Contributions made by such Member and such Member's allocable share of Net Income (and items thereof), and from which shall be deducted distributions to such Member of cash or other property and such Member's allocable share of Net Loss (and items thereof). To the extent not provided for in the preceding sentence, the Capital Accounts of the Members shall be adjusted and maintained in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

5.2.   Allocations to Capital Accounts.

(a)   Net Income and Net Loss. After giving effect to the special allocations set forth in Section 5.2(c) and subject to other provisions of this Section 5, Net Income and Net Loss for any Fiscal Year or other applicable period shall be allocated among the Members in accordance with and in proportion to their respective Percentage Interests.

(b)   Capital Account Reconciliation. Notwithstanding anything to the contrary contained in this Agreement, in the event that, upon liquidation and termination of the Company (and distribution of Net Cash Flow from Operations and Net Cash from Sales or Refinancing), the Capital Accounts of the Members are not reduced to zero and certain Members have positive Capital Accounts and other Members have negative Capital Accounts, then in such event it shall be the intent of this Agreement to re-allocate items of income, gain, revenues, costs, losses, deductions, and credits of the Company arising in connection with the liquidation and termination of the Company in such fashion as to reconcile such positive and negative Capital Account balances. Except as set forth in the immediately preceding sentence, no Member shall have the obligation to restore any negative Capital Account balance upon termination of the Company.

(c)   Allocations in Special Circumstances. The following special allocations shall be made in the following order:

(i) <u>Minimum Gain Chargeback</u>. Notwithstanding any other provision of this Section 5, if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations Section 1.704-2(b)(2) and (d)) during any Fiscal Year, the Members shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(f) and (g). This Section 5.2(c)(i) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(ii) <u>Member Minimum Gain Chargeback</u>. Notwithstanding any other provision of this Section 5, if there is a net decrease in partner nonrecourse debt minimum gain attributable to a partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(i)) during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in partner nonrecourse debt minimum gain attributable to such partner's nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i). This Section 5.2(c)(ii) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(iii) <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, in such Member's Capital Account (as determined under Treasury Regulations Section 1.704-1) as quickly as possible, provided that an allocation pursuant to this Section 5.2(c)(iii) shall be made only if and to the extent that such Member would have such Capital Account deficit after all other allocations provided for in Section 5.2 have been tentatively made as if this Section 5.2(c)(iii) were not in this Agreement. This Section 5.2(c)(iii) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv) <u>Gross Income Allocation</u>. In the event any Member has a deficit balance in such Member's Capital Account (as determined after crediting such Capital Account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such deficit (as so determined) of such Member's Capital Account as quickly as possible; <u>provided</u> that an allocation pursuant to this Section 5.2(c)(iv) shall be made only if and to the extent that such Member would have such Capital Account deficit (as so determined) after all other allocations provided for in Section 5.2 (other than Section 5.2(c)(iii)) have been tentatively made as if this Section 5.2(c)(iv) were not in this Agreement.

(v) <u>Loss Allocation Limitation</u>. No allocation of Net Loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase a deficit in such Member's Capital Account (as determined after debiting such Capital Account

for the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4),(5) and (6) and crediting such Capital Account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704).

(d)     Transfer of or Change in Interests. The Managers are authorized to adopt any convention or combination of conventions likely to be upheld for federal income tax purposes regarding the allocation and/or special allocation of items of Company income, gain, loss, deduction and expense with respect to a newly issued Interest, a transferred Interest and a redeemed Interest. A transferee of an Interest in the Company shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Interest.

5.3.    Tax Allocations.

(a)     General Rule. Except as otherwise provided in Section 5.3(b), for each fiscal period, items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the Net Income (and items thereof) or Net Loss (and items thereof) of which such items are components were allocated pursuant to Section 5.2.

(b)     Section 704(c) of the Code. Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Fair Market Value at the time of the contribution or deemed contribution in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder. Such allocations shall be made in such manner and utilizing such permissible tax elections as determined in the sole and absolute discretion of the Member. If there is a revaluation of Company property pursuant to the definition of Book Value, subsequent allocations of income, gains, losses or deductions with respect to such property shall be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its Fair Market Value in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder. Such allocations shall be made in such manner and utilizing such permissible tax elections as determined in the sole and absolute discretion of the Managers.

(c)     Tax Allocations Binding. The Members acknowledge that they are aware of the tax consequences of the allocations made by this Section 5.3 and hereby agree to be bound by the provisions of this Section 5.3 in reporting their respective shares of items of Company income, gain, loss, deduction and expense.

5.4.    Determinations by Managers.

All matters concerning the computation of Capital Accounts, the allocation of items of Company income, gain, loss, deduction and expense for all purposes of this Agreement and the adoption of any accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Managers in their sole and absolute discretion, provided that any such determination does not conflict with any of the terms of this Agreement. Such determinations

shall be final and conclusive as to all the Members. Without in any way limiting the scope of the foregoing, if and to the extent that, for income tax purposes, any item of income, gain, loss, deduction or expense of any Member or the Company is constructively attributed to, respectively, the Company or any Member, or any contribution to or distribution by the Company or any payment by any Member or the Company is recharacterized, the Managers may, in their sole and absolute discretion and without limitation, specially allocate items of Company income, gain, loss, deduction and expense and/or make correlative adjustments to the Capital Accounts of the Members in a manner so that the net amount of income, gain, loss, deduction and expense realized by each relevant party (after taking into account such special allocations) and the net Capital Account balances of the Members (after taking into account such special allocations and adjustments) shall, as nearly as possible, be equal, respectively, to the amount of income, gain, loss, deduction and expense that would have been realized by each relevant party and the Capital Account balances of the Members that would have existed if such attribution and/or recharacterization and the application of this sentence of this Section 5.4 had not occurred. Notwithstanding anything expressed or implied to the contrary in this Agreement, in the event the Managers shall determine, in their sole and absolute discretion, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to effectuate the intended economic sharing arrangement of the Members, the Managers may make such modification.

## SECTION 6

## DISTRIBUTIONS

6.1.     No Right to Withdraw.

No Member shall have the right to withdraw capital or demand or receive distributions or other returns of any amount in its Capital Account, except as expressly provided in this Section 6.

6.2.     Ordinary Distributions.

(a)     Timing.  Subject to the provisions of Section 6.4, the Company will distribute to the Members its Net Cash Flow from Operations and Net Cash Flow from Sales or Refinancing at such times, and in such amounts as the Managers shall determine in their sole discretion.

(b)     Distribution of Net Cash Flow from Operations.  Subject to the provisions of Section 6.4, Net Cash Flow from Operations will be distributed to the Members in accordance with their Percentage Interests.

(c)     Distribution of Net Cash Flow from Sales or Refinancing.  Subject to the provisions of Section 6.4, the Net Cash Flow from Sales or Refinancing will be distributed as follows:

(i)     First, to the Members until each Member has received full repayment of its Capital Contributions; and

(ii)     Thereafter, to the Members in accordance with their Percentage Interests.

6.3.   Distributions in Kind.

(a)     General Rule. Subject to the provisions of Section 6.4, if at any time the Managers, in their sole discretion, decides to make a distribution of property other than cash, such property shall be deemed to be sold for its Fair Market Value (net of any liabilities secured by such distributed property that the recipient Members are considered to assume or take subject to under Section 752 of the Code), and any gain or loss associated with such deemed sale shall be included in determining Net Income or Net Loss for purposes of the allocations specified in Section 5.2. Any such distributions shall be made after giving effect to the allocations required by Section 5.2, adjustments to Capital Accounts in respect of distributions of such property shall reflect such Fair Market Value and all such distributions shall be made in the same respective proportions as distributions would at the time be made pursuant to Section 6.2 or 12.2, as the case may be.

(b)     Legends on Certificates. The Managers may cause certificates evidencing the Units to be distributed and to be imprinted with legends as to the restrictions on transfer imposed by this Agreement that it may deem necessary or appropriate, including legends as to applicable federal or state securities laws or other legal or contractual restrictions, and may require any Member to agree in writing (i) that such Units will not be transferred except in compliance with such restrictions and (ii) to such other matters as the Managers may deem necessary or appropriate.

(c)     Allocations as Between Cash and Non-Cash. Except as provided in this Section 6.3, distributions consisting of both cash and other property shall be made, to the extent practicable, in equal proportions of cash and such other property as to each Member receiving such distributions.

6.4.   Restrictions on Distributions.

The foregoing provisions of this Section 6 to the contrary notwithstanding, no distribution shall be made:

(a)     if such distribution would violate any contract or agreement to which the Company is then a party or any law, rule, regulation, order or directive of any Governmental Authority then applicable to the Company;

(b)     to the extent that the Managers, in their sole discretion, determine that any amount otherwise distributable should be retained by the Company to pay, or to establish a reserve for the payment of, any liability or obligation of the Company, whether liquidated, fixed, contingent or otherwise; or

(c)     to the extent that the Managers, in their sole discretion, determine that the cash available to the Company is insufficient to permit such distribution.

6.5.   Withholding.

(a)   General Rule.  Notwithstanding any other provision of this Agreement, the Managers are authorized to take any action that they determine to be necessary or appropriate to cause the Company to comply with any foreign or United States federal, state or local withholding requirement with respect to any allocation, payment or distribution by the Company to any Member or other Person. All amounts so withheld, and, in the manner determined by the Managers in their sole and absolute discretion, amounts withheld with respect to any allocation, payment or distribution by any Person to the Company, shall be treated as distributions to the applicable Members under the applicable provisions of this Agreement. If any such withholding requirement with respect to any Member exceeds the amount distributable to such Member under the applicable provision of this Agreement, or if any such withholding requirement was not satisfied with respect to any amount previously allocated or distributed to such Member, such Member and any such successor or assignee with respect to such Member's Units hereby indemnifies and agrees to hold harmless the Managers and the Company for such excess amount or such withholding requirement, as the case may be.

(b)   Section 1446 Withholding.  Each of the Members acknowledge that the Company could, depending on the tax classifications of its Members, be required to withhold and remit tax to the Internal Revenue Service under Sections 1446 of the Code.  Each of the Members represents and warrants to the Company, the Managers and the other Members that: (i) they are United States residents within the meaning in the Code; (ii) the Company is not required to withhold under Section 1446 of the Code with respect to such Member; and (iii) in the event of an obligation to withhold under Section 1446 with respect to the owner(s) of any Member, such Member shall assume such obligations.

6.6.   Record Holders.

Any distribution of Company assets, whether pursuant to this Section 6 or otherwise, shall be made only to Persons who, according to the books and records of the Company, were the holders of record of Interests on the date determined by the Managers as of which the Members are entitled to any such distribution.

6.7.   Final Distribution.

The final distributions following dissolution of the Company shall be made in accordance with the provisions of Section 12.

SECTION 7

MANAGEMENT

7.1.   Management by Members.

The Company shall be managed by the Members and, as a result, shall be a member-managed company as defined in Section 608.402 of the Act.  The Managers shall devote such time to the business and affairs of the Company as they deem reasonably necessary therefor. The Members, in their capacity as managers, may be referred to as "Managers" or "Managing

Members." All decisions of the Managers require consent of one or more Managers which, as Members, own more than fifty percent (50%) of the Percentage Interests owned by all Members in the aggregate.

7.2.   General Powers of the Managers.

Subject to the provisions of Section 7.3, the Managers shall have the power and authority to manage the day to day operations of the Company, including assets held by the Company.

7.3.   Limitations on the Managers.

In addition to the restrictions set forth elsewhere in this Agreement, including Section 14, the Managers shall not take any of the following actions (a "Major Action") without the consent of a Majority-in-Interest:

(i)   do any act in contravention of any applicable law or regulation, or provision of this Agreement;

(ii)   possess Company property for other than a Company purpose;

(iii)   admit any Person as a Member of the Company except as permitted under this Agreement; or

(iv)   sell, transfer, assign or otherwise dispose of the Loan.

7.4.   Third Party Reliance.

Third parties dealing with the Company are entitled to rely conclusively upon the authority of the Managers as set forth in this Agreement.

7.5.   Designation of Tax Matters Partner.

The Managers shall designate a "Tax Matters Partner" under Section 6231(a)(7) of the Code, to manage administrative tax proceedings conducted at the Company level by the Internal Revenue Service with respect to Company matters. Each Member expressly consents to such designation and agrees that, upon the request of the Managers, it will execute, acknowledge, deliver, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Managers are specifically directed and authorized to take whatever steps the Managers in their sole and absolute discretion deem necessary or desirable to perfect such designation, including, without limitation, filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under Treasury Regulations. Expenses of administrative proceedings relating to the determination of Company items at the Company level undertaken by the Tax Matters Partner shall be a Company Expense. Without limiting the generality of the foregoing, the Tax Matters Partner shall have the sole and absolute authority to make any elections on behalf of the Company permitted to be made pursuant to Section 754 or any other Section of the Code or the Treasury Regulations promulgated thereunder.

7.6.   Other Activities of the Managers and Related Persons.

(a)   Ability to Engage in Other Activities.  Each Member expressly agrees that the Managers and each other Related Person may engage independently or with others, for its or their own accounts and for the accounts of others, in other business ventures and activities of every nature and description whether such ventures are competitive with the business of the Company or otherwise, including, without limitation, purchasing, selling or holding properties for the account of any other Person or enterprise or for its or their own account. Neither the Company nor any Member shall have any rights or obligations by virtue of this Agreement in and to such independent ventures and activities or the income or profits derived therefrom.

(b)   Engagement of Other Persons. The Managers may, from time to time, employ any Person or engage third parties to render services to the Company on such terms and for such compensation as the Managers may determine in their sole discretion, including, without limitation, attorneys, investment consultants, brokers or finders, independent auditors and printers. Such employees and third parties may be Affiliates of the Managers or of one or more of the Members. Persons retained, engaged or employed by the Company may also be engaged, retained or employed by and act on behalf of the Managers, one or more Members or any of their respective Affiliates.

(c)   Contract Restrictions. The Managers may cause the Company to enter into contracts and transactions with the Managers and any Person that directly or indirectly controls, is controlled by, or is under common control with the Managers, provided that the terms of any such contract or transaction are fair and reasonable to the Company and are not less favorable than could be obtained in arms-length negotiations with unrelated third parties for similar services.

7.7.   Conflicts of Interest.

While the Managers intend to avoid situations involving conflicts of interest, each Member acknowledges that there may be situations in which the interests of the Company may conflict with the interests of the Managers or any other Related Person or any Member. Each Member agrees that the activities of the Managers and any other Related Person or such Member that are specifically authorized by or described in this Agreement may be engaged in by the Managers or any such Related Person or such Member and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty owed by such Person to the Company or to any Member.

7.8.   Member Consent.  Any action, other than a Major Action, that requires the consent of the Members must be approved by a Majority-in-Interest.

SECTION 8

COMPANY EXPENSES

8.1.   Company Expenses.

All Company Expenses (including Organizational Expenses) shall be paid by the

Company from: (a) Capital Contributions made by the Members; and (b) income received by the Company from the Loan and any other sources. For purposes of this Agreement, the term "Company Expenses" includes the following:

(a) ordinary day-to-day expenses incurred by the Managers incidental to the administration of the Company by the Managers, including general overhead and compensation of its employees;

(b) all expenses incurred by the Company in connection with the purchase, holding, or disposition of the Loans or any other assets of the Company;

(c) all costs incurred in connection with the preparation of reports made to the Members;

(d) all costs incurred in connection with preparing and submission of tax filings for the Company;

(e) all costs related to litigation and claims involving the Company;

(f) all costs related to the Company's indemnification or contribution obligations set forth in this Agreement;

(g) the costs of any litigation, director and officer liability or other insurance and indemnification or extraordinary expense or liability relating to the affairs of the Company;

(h) all expenses of liquidating the Company; and

(i) any taxes, fees or other governmental charges levied against the Company and all expenses incurred in connection with any tax audit, investigation, settlement or review of the Company.

8.2.   Member's Expenses.   Each Member shall be solely responsible for its own expenses and out-of-pocket costs incurred in connection with the organization of, its admission to, and the maintenance of its Interest in, the Company.

8.3.   Advances to Cover Company Expenses.   The Managers shall have the right, in their sole discretion, to make advances to the Company (the "Advances") to cover any Company Expenses. All of the Advances shall bear interest at the Prime Rate.

SECTION 9

BOOKS OF ACCOUNT, RECORDS AND BANKING

9.1.   Maintenance of Books and Records. Etc.

(a)   Maintenance of Books and Records. The Company shall maintain books and records in such manner as is utilized in preparing the Company's United States federal information tax return in compliance with Section 6031 of the Code, and such other records as

may be required in connection with the preparation and filing of the Company's required United States federal, state and local income tax returns or other tax returns or reports of foreign jurisdictions, including, without limitation, the records reflecting the Capital Accounts and adjustments thereto specified in Section 5.

(b)     Access. All such books and records shall at all times be made available at the principal office of the Company and shall be open to the reasonable inspection and examination of the Members or their duly authorized representatives during normal business hours upon five (5) Business Days' prior written notice.

(c)     Banking. All funds of the Company may be deposited in such bank, brokerage or money market accounts as shall be established by the Managers. Withdrawals from and checks drawn on any such account shall be made upon such signature or signatures as the Managers may designate.

9.2.    Tax Information.

Subject to the Managers receiving all necessary information from third parties, within ninety (90) days after the end of each Fiscal Year of the Company, the Managers shall send each Person who was a Member at any time during the Fiscal Year then ended (including any permitted assignee of a Member who so requests in writing, whether or not a Substitute Member) a Schedule K-1 and such Company tax information as the Managers reasonably believe shall be necessary for the preparation by such Person of its United States federal, state and local tax returns in accordance with any applicable laws, rules and regulations then prevailing. Such information shall include a statement showing such Person's share of distributions, income, gain, loss, deductions and expenses and other relevant fiscal items of the Company for such Fiscal Year. Promptly upon the request of any Member, the Managers will furnish to such Member:

(a)     all United States federal, state and local income tax returns or information returns, if any, which the Company is required to file; and

(b)     such other information as such Member may reasonably request for the purpose of applying for refunds of withholding taxes, including to the extent not already set forth on the Schedule K-1.

9.3.    Annual Financial Statements and Other Reports.

(a)     Annual Financial Information.  Subject to the Managers receiving all necessary information from third parties, within ninety (90) days after the end of each Fiscal Year of the Company, the Managers shall send to each Person who was a Member in the Company at any time during the Fiscal Year then ended statements of assets, liabilities and Members' capital as of the end of such Fiscal Year and related statements of income or loss and changes in assets, liabilities and Members' capital, all prepared on the same basis used for the computation of adjustments to Capital Accounts.  The financial statements will be reviewed by the Company's accounting firm.

(b)    Quarterly Information.  Promptly after the end of each second and fourth calendar quarter, the Managers will mail to each Member a report summarizing the activities of the Company during the two (2) immediately preceding quarters.

## SECTION 10

## TRANSFER OF UNITS; SUBSTITUTE MEMBERS

10.1.  Assignments and Withdrawals by Members.

(a)    No Withdrawal.  No Member may withdraw or retire from the Company or make a demand for or receive paid-in capital until the termination of the Company.

(b)    Limited Right of Assignment.  No Member may directly or indirectly sell, transfer, assign, hypothecate, pledge or otherwise dispose of or encumber all or any part of such Member's Units (including, without limitation, any right to receive distributions or allocations in respect of such Interests and whether voluntarily, involuntarily or by operation of law) (each, an "Assignment") without the prior written consent of the Managers, the granting or denial of which shall be in the Managers' discretion, not to be unreasonably withheld; provided, however, that any Member may make any assignment to an Affiliate without the prior written consent of the Managers.  Each Member and each assignee thereof hereby agrees that it will not effect any Assignment of all or any part of its Units in the Company (whether voluntarily, involuntarily or by operation of law) in any manner contrary to the terms of this Agreement or that violates or causes the Company or the Managers to violate any laws, rules, regulations, orders and other directives of any Governmental Authority.

(c)    Admission of Assignees as Substitute Members.  No assignee of all or any part of the Units of a Member in the Company shall be admitted to the Company as a Substitute Member unless and until the Managers have consented to such substitution in their sole and absolute discretion, provided that an assignee of a Member that is an Affiliate thereof and has complied with the provisions of Section 10.1(b) shall be admitted as a Substitute Member without the consent of the Managers.  Unless and until an assignee of Units becomes a Substitute Member, such assignee shall not be entitled to exercise any vote, consent or any other right or entitlement with respect to such Units.  In the event of the admission of an assignee as a Substitute Member, all references herein to the assigning Member shall be deemed to apply to such Substitute Member, and such Substitute Member shall succeed to all rights and obligations of the assigning Member hereunder.  A Person shall be deemed admitted to the Company as a Substitute Member at the time that the foregoing provisions are satisfied.  The Managers shall revise Exhibit A to reflect such admission. No attempted Assignment and no substitution shall be recognized by the Company unless effected in accordance with and as permitted by this Agreement.

10.2.  Member's Right of First Refusal.

Notwithstanding any other provision of this Agreement, and except in the case of a transfer to an Affiliate, if a Member (the "Offering Member") desires to make an Assignment of its Units (the "Offered Interest") and the Assignment has been approved in accordance with this

Section 10, the Offering Member must also first offer in writing (or be deemed automatically to have offered) to sell the Offered Interests to the other Members (the "Non-Offering Members") at the price and upon terms no less favorable than the price and terms of the proposed transfer. Such notice to the Non-Offering Member shall contain a true and complete copy of the proposed contract or other document relating to the proposed transfer, including its price, terms and conditions, and the name, address (both home and office) and business or occupation of the Person to whom the Offering Member desires to transfer the Offered Interests. The Non-Offering Members shall have thirty (30) days from receipt of the notice within which to accept or reject such offer. If the Non-Offering Members fail to accept such offer in full within the 30-day period, the Offering Member may transfer all of the Offered Interest upon the terms and conditions of the notice given to the Non-Offering Members. If the transfer is not consummated within ninety (90) days after the expiration of the Non-Offering Member's 30-day option period, the provisions of this Section 10.2 will again apply to the Offered Interest as if no proposed transfer had been made. A transfer of an Offering Member's Interest shall be considered consummated when the Offering Member has received the full consideration for such Interest (a note is "received" when it is delivered, even if some installments are to be paid later).

    10.3.   Indirect Transfers.

In addition to the restrictions on transfer of Units set forth in this Article 10, if any Units are held by a Person that is not an individual, the owner(s) of the beneficial interests in such Person shall not sell, pledge, assign, transfer, mortgage, alienate, hypothecate or otherwise in any manner whatsoever encumber or dispose of the interests in such Person without complying with the restrictions on transfer set forth in this Agreement. Any attempted transfer in violation of this Section 10.3 shall be null and void.

## SECTION 11

## INDEMNIFICATION OF MANAGERS

    11.1.   Indemnification.

    (a)    The Company shall, to the maximum extent permitted by applicable law, indemnify and hold harmless all Related Persons (including the Managers) and the Company and each Member shall release each Related Person, to the fullest extent permitted by law, from and against any and all Damages, including, without limitation, Damages incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from any of the foregoing by or before any court or Governmental Authority, whether pending or threatened, whether or not a Related Person is or may be a party thereto, which, in the judgment of the Managers, arise out of, relate to or are in connection with this Agreement or the management or conduct of the business or affairs of the Managers, the Company, any other Person in which the Company has a direct or indirect interest or any of their respective Affiliates (including, without limitation, actions taken or not taken by any Related Person as a director of any Person in which the Company has a direct or indirect interest or any Affiliates of such Person or activities of any Related Person which relate to the offering and selling of interests in the Company), except for any such Damages that are finally found by a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence or intentional

misconduct of, or breach of this Agreement or knowing violation of law by, the Person seeking indemnification. Such attorneys' fees and expenses shall be paid by the Company as they are incurred upon receipt, in each case, of an undertaking by or on behalf of the Related Person on whose behalf such expenses are incurred to repay such amounts if it is ultimately determined that such Related Person is not entitled to indemnification with respect thereto.

(b)     The termination of any proceeding by settlement shall not be deemed to create a presumption that the Related Person involved in such settlement acted in a manner which constituted bad faith, gross negligence, intentional misconduct, breach of this Agreement or a knowing violation of law. The indemnification provisions of this Section 11.1 may be asserted and enforced by, and shall be for the benefit of, each Related Person, and each Related Person is hereby specifically empowered to assert and enforce such right. The right of any Related Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Related Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to his or its heirs, successors, assigns and legal representatives.

11.2.   Not Liable for Return of Capital.

Neither the Managers nor any other Related Person shall be personally liable for the return of the Capital Contributions of any Member or any portion thereof or interest thereon, and such return shall be made solely from available Company assets, if any.

SECTION 12

DURATION AND TERMINATION OF THE COMPANY

12.1.   Event of Termination.

The existence of the Company commenced on the date of the filing of Articles of Organization pursuant to the Company Act and shall continue until the first to occur of the following events (an "Event of Termination"):

(a)     The consent of all of the Members to dissolve the Company;

(b)     the last Business Day of the Fiscal Year in which all or substantially all of the assets of the Company (including the Loans) have been sold or otherwise disposed of; or

(c)     the entry of a decree of judicial dissolution pursuant to the Company Act.

12.2.   Winding-Up.

Upon the occurrence of an Event of Termination, the Company shall be dissolved and wound-up. In connection with the dissolution and winding-up of the Company, the Managers or, if there is no Manager, a liquidator or other representative (the "Liquidation Representative") appointed by a Majority-in-Interest shall proceed with the sale or liquidation of all of the assets of the Company (including the conversion to cash or cash equivalents of its notes or accounts

receivable) and shall apply and distribute the proceeds of such sale or liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

(a) first, to pay (or to make provision for payment of) all expenses of the liquidation in satisfaction of all obligations of the Company for such expenses of liquidation;

(b) second, to pay (or to make provision for the payment of) all creditors of the Company (other than Members who are creditors of the Company) in the order of priority provided by law or otherwise, in satisfaction of all debts, liabilities or obligations of the Company due such creditors;

(c) third, to the establishment of any reserve which the Managers or the Liquidation Representative, as the case may be, may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company (such reserve may be paid over by the Managers or the Liquidation Representative to an escrow agent acceptable to the Managers or the Liquidation Representative, to be held for disbursement in payment of any of the aforementioned liabilities and, at the expiration of such period as shall be deemed advisable by the Managers or the Liquidation Representative for distribution of the balance in the manner hereinafter provided in this Section 12.2);

(d) fourth, to pay (or to make provision for the payment of), in accordance with the terms agreed among them and, failing agreement, on a pro rata basis, all creditors of the Company that are Members (other than in respect of distributions owing to them hereunder); and

(e) fifth, after the payment (or the provision for payment) of all debts, liabilities and obligations of the Company in accordance with each of the clauses above, to the Members or their legal representatives in accordance Section 6.2(c), no later than the end of the Fiscal Year in which the Event of Termination occurs or, if later, within ninety (90) days after the date of the liquidation of the Company.

12.3.  Distributions in Cash or in Kind on a Winding Up.

(a) Upon dissolution, the Managers or the Liquidation Representative, as the case may be, may in its sole and absolute discretion (a) liquidate all or a portion of the Company assets and apply the proceeds of such liquidation in the manner set forth in Section 12.2 and/or (b) hire independent appraisers to appraise the value of Company assets not sold or otherwise disposed of (the cost of such appraisal to be considered a Company Expense) or determine the Fair Market Value of such assets, and allocate any unrealized gain or loss determined by such appraisal to the Members' respective Capital Accounts as though the properties in question had been sold on the date of distribution and, after giving effect to any such adjustment, distribute said assets in the manner set forth in Section 12.2, provided that the Managers or the Liquidation Representative shall in good faith attempt to liquidate sufficient Company assets to satisfy in cash the debts and liabilities described in Section 12.2.

(b) If a Member shall, upon the advice of counsel, determine that there is a reasonable likelihood that any distribution in kind of an asset would cause such Member to be in violation of any law, regulation or order, such Member and the Managers shall each use their

best efforts to make alternative arrangements for the sale or transfer into an escrow account of any such distribution on mutually agreeable terms.

### 12.4. Time for Liquidation.

A reasonable amount of time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Managers or the Liquidation Representative to minimize the losses attendant upon such liquidation.

### 12.5. Termination.

Upon compliance with the foregoing distribution plan, the Company shall cease to be such, and the Managers or the Liquidation Representative, as the case may be, shall execute, acknowledge and cause to be filed with the Secretary of State of the State of Florida a notice of dissolution of the Company pursuant to the power of attorney contained in Section 15.11. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of such certificate of cancellation of the Company with the Secretary of State of the State of Florida.

## SECTION 13

## DISSOLUTION, ETC. OF MEMBERS

The death, incapacity, bankruptcy, dissolution, liquidation, retirement, resignation, withdrawal or removal (each a "Disabling Event") of a Member shall not dissolve the Company, and the Company shall continue in a reconstituted form, if necessary, without any action on the part of the remaining Members. The trustee, executor, administrator, committee or guardian of the Member or of the Member's estate, as the case may be, shall have all the rights of the Member for the purpose of settling or managing the estate and such power as such Member possessed to assign all or part of such Member's Interest, provided that any such trustee, executor, administrator, committee or guardian shall become a Substitute Member only upon compliance with the provisions of Section 10.1.

## SECTION 14

## AMENDMENTS

### 14.1. Amendments Requiring Consent of Members.

(a)     Except as otherwise provided in this Section 14.1 or Section 14.2 below, the provisions of this Agreement (and all defined terms used therein) may be modified or amended with the written consent of the Managers and a Majority-in-Interest of the Members.

(b)     Notwithstanding any other provisions of this Agreement, including Sections 14.1 and 14.2, the provisions of this Agreement may not be modified or amended without the written consent of the Managers and all of the Members if such modification or amendment would: (i) increase the commitment of any Member to make contributions of capital to the Company without the consent of such Member, (ii) increase the liability of any Member

without the consent of such Member, or (iii) adversely affect the economic rights of any Member without the consent of such Member.   Nothing in this Section 14.1(b) is intended to restrict the right of the Company and the Managers to take any actions otherwise authorized by the terms of this Agreement.

### 14.2.   Amendments by Managers.

Notwithstanding the provisions of Section 14.1 and this Section 14.2, the Managers shall have the authority to amend or modify this Agreement without any vote or other action by the other Members, as expressly permitted by Section 15.11 or to satisfy any requirements, conditions, guidelines, directives, orders, rulings or regulations of any Governmental Authority, or as otherwise required by applicable law. Subject to the provisions of Section 14.1, the Managers shall have the authority to amend or modify this Agreement without any vote or other action by the Members: (a) to reflect the admission of substitute, additional or successor Members and transfers of Units pursuant to this Agreement; (b) to form, qualify or continue the Company as a limited liability company (or another form of entity in which the Members have limited liability) in all jurisdictions in which the Company conducts or plans to conduct business; (c) to change the name of the Company; (d) to cure any ambiguity or correct or supplement any provisions herein contained which may be incomplete or inconsistent with any other provision herein contained; or (e) to correct any typographical errors contained herein.

### SECTION 15

### MISCELLANEOUS

### 15.1.   Waiver of Partition.

Each of the Members hereby irrevocably waives any and all rights that such Members may have to maintain any action for partition of any of the Company's property.

### 15.2.   Entire Agreement.

This Agreement together with the documents expressly referred to herein, each as amended or supplemented, constitutes the entire agreement among the parties with respect to the subject matter herein or therein. They supersede any prior agreement or understanding among the parties hereto.

### 15.3.   Choice of Law.

THIS AGREEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF) AND, WITHOUT LIMITATION THEREOF, THE COMPANY ACT AS NOW ADOPTED OR AS MAY BE HEREAFTER AMENDED SHALL GOVERN THE COMPANY ASPECTS OF THE AGREEMENT.

15.4.   Successors and Assigns.

Except as otherwise specifically provided herein, this Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

15.5.   Severability.

Each provision of this Agreement shall be considered severable and if, for any reason, any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable shall not be affected thereby.

15.6.   Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. It shall not be necessary for all Members to execute the same counterpart hereof.

15.7.   Additional Documents.

Subject to the provisions of this Agreement, each party hereto agrees to execute, with acknowledgment or affidavit, if required, any and all documents and writings which may be necessary or expedient in connection with the creation of the Company and the achievement of its purposes, specifically including (a) any amendments to this Agreement and such certificates and other documents as the Managers deem necessary or appropriate to form, qualify or continue the Company as a limited liability company (or another form of entity in which the Members have limited liability) in all jurisdictions in which the Company conducts or plans to conduct business and (b) all such agreements, certificates, tax statements, tax returns and other documents as may be required of the Company or its Members by the laws of the United States of America or any jurisdiction in which the Company conducts or plans to conduct business, or any political subdivision or agency thereof.

15.8.   Non-Waiver.

No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the party claiming such waiver has occurred, provided that no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

15.9.   Manner of Consent.

Any consent or approval required by this Agreement may be given as follows: (a) by a written consent given by the consenting Member at or prior to the taking of the action for which the consent is solicited, provided that such consent shall not have been nullified by either

(i) notification to the Managers by the consenting Member at or prior to the time of, or the negative vote by such consenting Member at, any meeting held to consider the taking of such action or (ii) notification to the Managers by the consenting Member prior to the taking of any action which is not subject to approval at such meetings; or (b) by the affirmative vote of the consenting Member to the taking of the action for which the consent is solicited at any meeting duly called and held to consider the taking of such action.

15.10. Notices.

(a)     To be effective, unless otherwise specified in this Agreement, all notices and demands, consents and other communications under this Agreement must be in writing and must be given: (i) by depositing the same in the United States mail, postage prepaid, certified or registered, return receipt requested; (ii) by delivering the same in person and receiving a signed receipt therefor; (iii) by sending the same by an internationally recognized overnight delivery service; or (iv) by telecopy of electronic mail. The addresses of the Managers shall be as set forth in Exhibit A, and the address of the Company shall be as set forth in Section 2.4.

(b)     Notices, demands, consents and other communications mailed in accordance with the foregoing clause (i) shall be deemed to have been given and made three (3) Business Days following the date so mailed, provided that any notice to the Managers shall be effective only if and when received by the Managers. Notices, demands, consents and other communications given in accordance with the foregoing clauses (a)(ii) or (iii) shall be deemed to have been given when delivered. Notices, demands, consents and other communications given in accordance with the foregoing clause (a)(iv) shall be deemed to have been given when sent. Notices, demands, consents and other communications to the Members are effective when delivered in accordance with the foregoing to each Member or its representative.

(c)     Any Member, representative, the Company or the Managers or their assignee may designate a different address to which notices or demands shall thereafter be directed and such designation shall be made by written notice given in the manner hereinabove required and, in the case of any representative, directed to the Company at its offices as hereinabove set forth.

15.11. Grant of Power of Attorney.

Each Member hereby irrevocably constitutes and appoints the Managers as their true and lawful attorney and agent, in its name, place and stead to make, execute, acknowledge and, if necessary, to file and record:

(a)     Any certificates or other instruments or amendments thereof which the Company may be required to file under the Company Act or pursuant to the requirements of any Governmental Authority having jurisdiction over the Company or which the Managers shall deem it advisable to file, including, without limitation, this Agreement, any amended Agreement and a notice of dissolution as provided in Section 12.5;

(b)     Any certificates or other instruments (including counterparts of this Agreement with such changes as may be required by the law of other jurisdictions) and all amendments thereto which the Managers deem appropriate or necessary to qualify, or continue

the qualification of, the Company as a limited liability company (or another form of entity in which the Members have limited liability) and to preserve the limited liability status of the Company in the jurisdictions in which the Company may acquire investments;

(c)     Any certificates or other instruments which may be required in order to effectuate any change in the membership of the Company or to effectuate the dissolution and termination of the Company pursuant to Section 12; and

(d)     Any amendments to any certificate or to this Agreement necessary to reflect any other changes made pursuant to the exercise of the powers of attorney contained in this Section or pursuant to this Agreement.

15.12.   Irrevocable and Coupled with an Interest; Copies to Be Transmitted.

The powers of attorney granted under Section 15.11 shall be deemed irrevocable and to be coupled with an interest. A copy of each document executed by the Managers pursuant to the powers of attorney granted in Section 15.11 shall be transmitted to each Member promptly after the date of the execution of any such document.

15.13.   Survival of Power of Attorney.

The powers of attorney granted in Section 15.11 shall survive delivery of an Assignment by any Member of the whole or any part of such Member's Interest, provided that if such Assignment was of all of such Member's Interest and the substitution of the assignee as a Member has been consented to by the Managers, the foregoing powers of attorney shall survive the delivery of such Assignment for the purpose of enabling the Managers to execute, acknowledge and file any and all certificates and other instruments necessary to effectuate the substitution of the assignee as a Substitute Member. Such powers of attorney shall survive the death, incapacity, dissolution or termination of a Member and shall extend to such Member's successors and assigns.

15.14.   Limitation of Power of Attorney.

Except as expressly set forth in Section 14, the powers of attorney granted under Section 15.11 cannot be utilized by the Managers for the purpose of increasing or extending any financial obligation or liability of a Member or altering the method of division of profits and losses or the method of distributions in connection with the investment of a Member without the written consent of such Member.

15.15.   Voting Rights; Meetings.

Except as set forth in Sections 3.4 and 4.2, the Members shall be permitted to exercise any of the voting rights prescribed in this Agreement unless, prior to the exercise by the Members of any specified voting right or rights, the Company shall have obtained (and furnished a copy thereof to each Member) an opinion of counsel for the Company acceptable to at least a Majority-in-Interest to the effect that the exercise of such specified right or rights will (a) adversely affect the limited liability of the Members, or (b) adversely affect the classification of the Company as a partnership for federal income tax purposes.

15.16. Submission to Jurisdiction.

Each Member irrevocably consents and agrees that any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof may be brought in the courts of the State of Florida located in Miami-Dade County, Florida or the United States federal courts for the Southern District of Florida, and, by execution and delivery of this Agreement, each Member hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof. Each Member further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof in the manner set forth in Section 15.10. Each Member hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum. Nothing herein shall affect the right of the Managers or the Company to serve process in any other manner permitted by law or to commence legal actions or proceedings or otherwise proceed against any other Member hereunder in any other jurisdiction. Nothing in this Section shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter not specifically referred to herein.

15.17. Entity Classification.

It is the intention of the Members that the Company be treated as a partnership for income tax purposes and not as an association taxable as a corporation.

15.18. Survival.

All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a party would be entitled to be indemnified or reimbursed, as the case may be.

15.19. Waiver of Trial by Jury.

TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY MATTER ARISING HEREUNDER.

15.20. Representation of Shutts & Bowen LLP.

The parties acknowledge that Shutts & Bowen LLP has only acted as counsel to Javier Macedo and his Affiliates and Felisberto Camacho and his Affiliates in connection with this Agreement and the transactions contemplated by this Agreement. All other Members have been advised and have had the opportunity to obtain their own legal counsel with respect to these matters.

15.21. <u>GENERAL RELEASE</u>.

IN CONSIDERATION OF ALL OF THE ABOVE, AND EXCEPT FOR THE OBLIGATIONS PROVIDED FOR IN THIS AGREEMENT AND THOSE CERTAIN RESERVATION AND SUBSCRIPTION AGREEMENTS BY AND BETWEEN THE COMPANY AND EACH MEMBER AS SUBSCRIBER, EACH OF THE PARTIES TO THIS AGREEMENT, TOGETHER WITH THEIR MEMBERS, PREDECESSORS, SUCCESSORS, AFFILIATES, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, REPRESENTATIVES, ATTORNEYS AND ASSIGNS (THE "RELEASORS") DO HEREBY RELEASE, ACQUIT AND FOREVER DISCHARGE EACH OTHER, TOGETHER WITH THEIR PARENTS, SUBSIDIARIES, PREDECESSORS, SUCCESSORS, AFFILIATES, OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, REPRESENTATIVES, ATTORNEYS AND ASSIGNS (THE "RELEASEES"), FROM ANY AND ALL CLAIMS, COUNTERCLAIMS, DEMANDS, DEBTS, ACTIONS, CAUSES OF ACTIONS, SUITS, CONTRACTS, AGREEMENTS, OBLIGATIONS, ACCOUNTS, DEFENSES, OFFSETS AND LIABILITIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER ARISING IN TORT, BY CONTRACT, BY VIRTUE OF STATUTE, OR OTHERWISE, DIRECT OR INDIRECT, KNOWN OR UNKNOWN, LIQUIDATED OR CONTINGENT, SUSPECTED OR UNSUSPECTED, IN LAW OR IN EQUITY, WHICH THE RELEASORS EVER HAD, NOW HAVE OR HEREAFTER CAN, SHALL OR MAY HAVE, FOR, UPON OR BY REASON OF ANY MATTER, CAUSE OR THING WHATSOEVER AGAINST THE RELEASEES FROM THE BEGINNING OF THE WORLD TO THE DATE OF THIS AGREEMENT.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in multiple counterparts as of the day and in the year first above written, and each of such counterparts, when taken together, shall constitute one and the same instrument.

**MEMBERS:**

[Insert Name of Member]

By:_____
Name:_____
Title:_____

[Insert Name of Member]

By:_____
Name:_____
Title:_____

The undersigned, as principals of the Members, hereby acknowledge and agree to be bound by the provisions of Sections 4.5, 10.3 and 15.21 of this Agreement.

_____
[Insert Name]

_____
[Insert Name]

**Exhibit A**

**Schedule of Members**

| Name and Address of Member and Managers | Initial Contribution | Units | Percentage Interest |
|---|---|---|---|
| _____ <br> _____ <br> _____ <br> Facsimile: _____ <br> Email: _____ | $ | | |
| _____ <br> _____ <br> _____ <br> Facsimile: _____ <br> Email: _____ | $ | | |
| _____ <br> _____ <br> _____ <br> Facsimile: _____ <br> Email: _____ | $ | | |
| Total | $_____ | 300 | 100% |

**Glorialee Velez**

| | |
|---|---|
| **From:** | Patricia Montes de Oca |
| **Sent:** | Tuesday, March 01, 2011 11:18 AM |
| **To:** | Glorialee Velez |
| **Subject:** | FW: FW Emailing Letter to Souto 070910 |
| **Attachments:** | Letter to Souto 070910.pdf |

-----Original Message-----
From: Jorge Otero [mailto:jeo@oterolaw.com]
Sent: Tuesday, March 01, 2011 11:11 AM
To: Patricia Montes de Oca
Cc: Carlos Concepcion; maromagnoli@atlanticbb.net; Roberto Romagnoli
Subject: FW Emailing Letter to Souto 070910

  <<Letter to Souto 070910.pdf>> Attached letter to give you a flavor

Jorge E. Otero, Esq.
Jorge E. Otero & Associates, P.A.
Attorneys at Law
75 Valencia Avenue, 2nd Floor
Coral Gables Fl 33134

  *Now serving as Certified Circuit Civil Mediator with offices in South Florida**

Tel: 305-567-9000
Fax: 305-443-0164

CONFIDENTIALITY NOTE - LEGALLY PRIVILEGED COMMUNICATION:
This e-mail and any attachments are confidential and privileged, and are protected from any disclosure by law. If you
are not the intended recipient, be advised that any viewing, copying, downloading, transmittal, dissemination or other
use of this e-mail and attachments is strictly prohibited. If you have received this e-mail in error please immediately
respond to the sender identified below and delete this e-mail and any copies from your system.

-----Original Message-----
From: Norma G
Sent: Friday, July 09, 2010 3:20 PM
To: Jorge Otero
Subject: Emailing: Letter to Souto 070910

The message is ready to be sent with the following file or link attachments:

Letter to Souto 070910

1

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.



**OCEAN BANK**

February 24, 2010

SAN REMO HOMES AT HOMESTEAD, LLC.
10 NW Le Jeune Road, Suite 500
Miami, Florida 33126
Attention: Marco Romagnoli, Roberto Romagnoli, Felisberto Figueira Camacho, and Javier
Macedo Rodrigues

Re:  Extension and Modification of the existing Loan No. 1015429153 to
   continue to be secured by a first mortgage lien on property located at approximately
   the east side of SW 162nd Avenue, just north of SW 320th Street, in Homestead,
   Florida ("Mortgaged Property").

Dear Gentlemen:

We are pleased to inform you that OCEAN BANK ("Bank") has approved the above mentioned
request subject to the following terms and conditions:

**TERMS OF LOAN:**

1.   **Borrowers:**

   The Borrower for this Loan shall be **SAN REMO HOMES AT HOMESTEAD, L.L.C.,
   a Florida limited liability company** ("Borrower").

2.   **Guarantor(s):**

   The Loan and performance of all of the Borrower's obligations, as described herein, will
   be irrevocably and unconditionally guaranteed jointly and severally (if more than one
   guarantor(s)) by:

   **Marco Romagnoli, Roberto Romagnoli, Felisberto Figueira Camacho, and Javier
   Macedo Rodrigues**

   In addition, any person or entity who directly or indirectly owns fifteen percent (15%) or
   more of the ownership interest in the Borrower shall also guarantee the Loan and
   Borrower's obligations under the Loan Documents.

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 2 of 12

3.    **Purpose of the Loan:**

Extension of the existing maturity for an additional twelve (12) months and modification. This Extension and Modification is subject to a 5% curtailment and twelve (12) month interest reserve requirement.  Borrower intends to proceed with the development of the subject property once applicable permits are obtained.   Borrowers has been recently approved for a tentative plat that would provide optimal land use for future construction.

4.    **Amount:**

The principal amount of the Loan shall be **$828,495.00** (inclusive of a 5% curtailment of $43,605.00).

5.    **Rate of Interest:**

Interest shall be based on the prime rate as published by the Wall Street Journal, under the Money Rate Section at that time, plus one (1%) percent, calculated each day on a 360-day year, based on the outstanding principal balance, and any accrued interest due at maturity.

The Rate of Interest in effect during the life of the Loan shall never be less than 6.95% percent per annum.

6.    **Terms:**

The Loan shall mature on March 29, 2011.

7.    **Repayment:**

Twelve (12) monthly payments of interest only at the Rate of Interest stated in Paragraph 5 above.

The Rate of Interest in effect during the life of the Loan shall never be less than 6.95% percent per annum.

8.    **Collateral:**

The Loan shall be evidenced and secured by the loan documentation that shall consist of the following ("Loan Documents"), inclusive of the existing loan documents:

A.      An Amended Promissory Note in the amount of **$828,495.00.**

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 3 of 12

B.    An Extension and Modification of Note and Mortgage Agreement modifying that certain first mortgage and security agreement ("Mortgage") created as a first mortgage upon the real estate property and improvements compromising the land and all improvements consisting of 6.45 acres of vacant land located at the east side of SW 162nd Avenue and 320th Street in Homestead, Florida.

All together with:  All furniture, furnishings, fixtures, equipment, and building materials presently owned or in the future acquired, that may be found on or associated with the property and the improvements currently existing or to be built in the future, and proceeds (including but not limited to insurance proceeds) and products of the foregoing (collectively, "Mortgaged Property").

(i)    Legal Description:

The North 467.81 feet of Tracts 15, 16, and 17, Block 1, MIAMI LAND& DEVELOPMENT COMPANY'S SUBDIVISION, SECTION 17, TOWNSHIP 57 SOUTH, RANGE 39 EAST, according to the Plat thereof as recorded in Plat Book 5 at Page 10 of the Public Records of Miami-Dade County, Florida, LESS the Westerly 75.00 feet thereof for right of way purposes.

C.    Such other documents as may be deemed necessary by the Bank, or its Counsel, in their sole discretion, to secure or service the Loan together with all existing loan documents executed in connection with the Loan.

9.    **Costs and Expenses:**

A.    <u>Commitment fee</u>: A non-refundable commitment fee in the amount of one-half percent (0.50%) or $4,142.48, payable as follows:

i. $2,071.24 upon execution of this commitment; and
ii. $2,071.24 due at closing.

B.    <u>Document Preparation and Closing Fee</u>:  At the time of closing, a document preparation and closing fee will be charged at the prevailing hourly rate charged by the Bank's Counsel.

C.    <u>Underwriting Fees</u>:  A $250.00, underwriting fee will be charged at the time of closing.

D.    <u>Out of pocket expenses</u>:  Including without limitation, any and all brokerage commissions, appraisal fees, credit report costs, title insurance costs and premiums, survey costs, recording and filing fees, documentary stamp taxes,

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 18, 2010
Page 4 of 12

intangible taxes, environmental assessment and any other costs and expenses associated with this Loan.

E.   Deficiencies and/or Additional Costs:   Upon acceptance of this commitment, Borrower understands and hereby agrees that in the event the deposit(s) collected by the Bank, are insufficient to pay the full costs thereof the Borrower will pay any deficiency upon demand. This will also include any additional costs and expenses incurred by the Bank relative to the preparation of the closing for this Loan.

**10.   Contingencies:**

Closing will be contingent upon receipt and satisfactory review by the Bank of the following:

(i)     Verification of stated income through certified accountant letter for Felisberto Fugueira and Javier Macedo.

(ii)    Loan closing is subject to a 5% principal curtailment and 12 month interest reserve up front.

(iii)   Payment of 2009 Real Estate Taxes prior to closing.

**11.   Title Insurance:**

Title Insurance Endorsement to the existing Mortgagee Title Insurance Policy for the full amount of the Loan, to protect the Bank's interest in the Mortgaged Property, will be furnished to the Bank by Nicolas Fernandez, Esquire ("Title Company"). By accepting this Commitment Borrower certifies that the Title Company/Title Agent is not related and/or has any management interest in the borrowing entity. The cost of the mortgagee title insurance policy will be paid at closing by the Borrower.

**12.   Escrow:**

An Escrow account for real estate taxes and insurance will not be required.

**13.   Pre-Requisites to Closing:**

A.   Estoppel Information:   Prior to closing, Borrower shall provide the Bank and/or Bank's Counsel with current, complete estoppel information on any existing prior debt.

B.   Appraisal: N/A

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 5 of 12

C.  <u>Hazard and Windstorm Insurance:</u>  Prior to closing, Borrower shall provide the Bank with a Multi-Peril and Windstorm Insurance Policy in a form and amount of the insurable improvements and written by a company acceptable to the Bank. On loans in excess of $5,000,000.00, with the exception of track housing and land loans, the Bank will require the Borrower to obtain insurance coverage with an insurance company that has at least a minimum rating of B+ (very good) for property/casualty insurance coverage as determined by A.M. Best Company. Policy will include mortgagee loss payee clause satisfactory to Bank and an agreement to notify the Bank in writing at least thirty (30) days prior to any cancellation or reduction in coverage. In the event that adequate coverage cannot be secured with an approved company satisfactory to the Bank and maintained during the terms of the Mortgage, the Bank shall have the right to accelerate the principal outstanding balance of the Loan or force place insurance.  Property insurance policies with windstorm deductibles greater than 5% must be approved by Bank on an individual basis. When property insurance policies exclude windstorm coverage in the Windstorm Pool areas, Borrower must obtain the maximum coverage from the Florida Windstorm Underwriting Association.

D.  <u>Liability Insurance:</u>  Prior to closing, Borrower shall provide the Bank with a comprehensive general commercial liability insurance policy for the benefit of the Borrower and Ocean Bank, naming Ocean Bank as an additional insured. On loans in excess of $5,000,000.00, with the exception of track housing and land loans, the Bank will require the Borrower to obtain insurance coverage with an insurance company that has at least a minimum rating of B+ (very good) for property/casualty insurance coverage as determined by A.M. Best Company. In the event that adequate coverage cannot be secured with an approved company satisfactory to the Bank and maintained during the terms of the Mortgage, the Bank shall have the right to accelerate the principal outstanding balance of the Loan or force place insurance.

E.  <u>Flood Insurance:</u>  Prior to closing, Borrower shall provide the Bank with a flood insurance policy if the Mortgaged Property is in a "Special Flood Hazard Area", as defined by the Flood Insurance Rate Map issued by the Department of Housing and Urban Development. The policy will include a mortgagee loss payee clause satisfactory to the Bank and an agreement to notify the Bank in writing, at least thirty (30) days prior to any cancellation or reduction in coverage. On loans in excess of $5,000,000.00, with the exception of track housing and land loans, the Bank will require the Borrower to obtain insurance coverage with an insurance company that has at least a minimum rating of B+ (very good) for property/casualty insurance coverage as determined by A.M. Best Company. In the event that adequate coverage cannot be secured with an approved company

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 6 of 12

satisfactory to the Bank and maintained during the terms of the Mortgage, the Bank shall have the right to accelerate the principal outstanding balance of the Loan or force place insurance.

F. <u>Survey:</u>  Prior to closing, the Borrower shall provide the Bank with three (3) original, sealed surveys for the Mortgaged Property, performed by a duly registered land surveyor, and certified to Ocean Bank, its successors and/or its assigns, the Borrower, the attorney preparing the title insurance, and the Title Insurance Company, dated within sixty (60) days prior to the closing. The survey must reflect the correct legal description of the Mortgage Property, shall show the location and perimeter boundaries of the Mortgaged Property, shall disclose access, elevations, all improvements, encroachments, easements and rights-of-way, and shall reflect no conditions unsatisfactory to Bank, its Counsel or the Title Company. Borrower shall be responsible for the total cost of the survey.

G. <u>Environmental Audit:</u> N/A

H. <u>Taxes, Assessments and Charges:</u>  Prior to closing, Borrower shall provide to the Bank evidence, satisfactory to the Bank that all real estate taxes, assessments, charges, liens, etc., have been paid in full.

I. <u>Opinion Letter:</u>  Prior to closing, Borrower shall provide to the Bank an opinion letter from Borrower's attorney confirming Borrower's and Guarantor(s) authority to enter into the Loan, to execute the Loan Documents  and that there is no litigation or claims existing or threatened against the Borrower and/or Guarantor(s).

J. <u>Leases:</u>  Borrower shall provide to Bank with copies of all leases affecting the Mortgaged Property along with credit reports, financial information and resumes on each tenant. Each lease must be in form and substance acceptable to the Bank and shall be subordinated to the lien of this Mortgage.  Upon expiration and/or renewal of any of the leases, Borrower shall provide the Bank with copies of the executed new leases.

K. Borrower  shall  submit  to  the  Bank  all  joint  venture  agreements,  limited partnership agreements, and trust agreements in connection with this Loan and such agreements must be approved by the Bank and the Bank's Counsel.

L. Borrower, if a corporation, partnership or other business entity, shall provide to the Bank, evidence that it is duly organized, validity existing and in Good Standing under the laws governing its organization or incorporation and has full power and authority to consummate this transaction.

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 7 of 12

    M.     Intentionally deleted.

    N.     Intentionally deleted.

    O.     Intentionally deleted.

    P.     Borrower shall provide to the Bank, its' IRS Identification Number for tax reporting purposes relating to interest.

**14.**   **Bank's Counsel:**

ROBERTO F. FLEITAS, JR., P.A., 782 NW LE JEUNE RD., # 530, MIAMI, FLORIDA 33126 will act as Counsel to the Bank in regard to this matter.

**15.**   **Loan Documents:**

Bank's Counsel shall prepare the necessary documentation in order to comply with all the terms and conditions of this commitment and to comply with applicable law. The Loan Documents, as to form and content, are to be acceptable to the Bank's Counsel, are to be joined by all signatories required to create the security interest provided for herein, and are to include all terms and provisions customarily incorporated into such documents. Legal costs shall be borne by Borrower. Bank's Counsel shall be responsible for the recording of the Mortgage and all other recordable Loan Documents, including UCC Filings filed with the Secretary of the State of Florida, as well as any documents necessary to perfect title in the Borrower and insure the Bank's lien position in the Mortgage and any other security document.

**16.**   **Closing:**

The closing of this transaction shall be held on or before ninety (90) days from the date of the acceptance of this commitment unless delayed by the Bank or its attorneys. The closing shall take place at the offices of the Counsel for the Bank and the exact date and time shall be scheduled by such Counsel upon providing the Borrower with prior notice. The Bank shall not be required to establish a closing date unless the Borrower shall have complied with all the conditions and requirements set forth herein. Unless the closing is held within said ninety (90) day period, the Bank's obligation hereunder will, at its option, terminate.

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 8 of 12

17. **Borrower's Covenants:**

    A.    <u>Bank Accounts:</u> Borrower covenants to and agrees with the Bank that, for so long as any obligations under the Note shall be outstanding; Bank shall be the prime depository for the personal and business accounts of Borrower. Borrower recognizes that such covenant and agreement was an important factor and a material inducement to the Bank in establishing the terms and conditions, including the interest rate, of the Loan evidenced by this Note. If Borrower violates this covenant and agreement, Bank may elect, upon written notice to any one Borrower, mailed to its address as shown on the Bank's records, to increase the interest rate set forth in the Note to a rate specified in such notice, which rate shall not exceed the maximum permissible legal rate, effective from the date of such notice.

    B.    <u>Financial Statements:</u> Borrower hereby agrees to provide current, complete financial statements of Borrower and every Guarantor(s) in form and content satisfactory to the Bank. Borrower further agrees to provide such statements annually at its own expense, as long as the Loan is outstanding.

    C.    <u>No Secondary Financing Allowed:</u> Borrower hereby agrees that it will not obtain any secondary financing on the Mortgaged Property which secures the Loan from the Bank to Borrower, or otherwise encumber said property without the prior written consent of the Bank.

    D.    <u>Restriction on change of ownership and further encumbrances:</u> Borrower agrees that Borrower's right under this commitment and the Loan shall be personal since the Bank has evaluated this Loan and has agreed to make this Loan based on the unique qualifications of Borrower and Guarantor(s), both financial and otherwise. So long as this commitment or any part of the Loan is outstanding, the Mortgaged Property shall remain free and clear of all other encumbrances, liens, mortgages, security interest and secondary financing, and Borrower shall not, without prior written consent of Bank, sell, transfer, encumber or convey all or any part of its interest in the Mortgaged Property or any portion thereof. Additionally, any change in the present stock ownership of the borrowing corporation or change in partnership structure or other breach of the foregoing provision shall constitute a default under the Note and Mortgage, or if prior to closing, shall constitute grounds for terminating this commitment.

    E.    <u>New Appraisal:</u> The Bank shall have the right to conduct or have conducted by an independent appraiser acceptable to the Bank updated appraisals of the Mortgaged Property in form and substance satisfactory to the Bank at the sole cost and expense of Borrower; provided, however, that Borrower shall not be obligated to bear the

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 9 of 12

expense of more than one such appraisal in any six (6) month period unless: (a) an event of default exists, or (b) such appraisal is required by applicable law, rule or regulation of any governmental authority having jurisdiction over the Bank. The cost of such appraisals, if chargeable to Borrower as aforesaid shall be secured by the Mortgage.

F.     Control Business/Affiliate Relationship with Title Agent:  N/A

18.    Sale of Loan Documents:

The Bank may from time to time, without prior notice to Borrower and/or Guarantor(s), as the context so requires, sell or assign, in whole or in part, or grant participations in, the Loan, the Note, this Mortgage and/or the obligations evidenced thereby. The holder of any such sale, assignment or participation, if the applicable agreement between the Bank and such holder so provides, shall be: (a) entitled to all the rights, obligations and benefits of the Bank; and (b) deemed to hold and may exercise the rights of setoff or banker's lien with respect to any and all obligations of such holder to Borrower and/or Guarantor(s), as the context so requires, in each case as fully as thought Borrower and/or Guarantor(s), as the context so requires, were directly indebted to such holder. Bank may in its discretion give notice to Borrower and/or Guarantor(s), as the context so requires, of such sale, assignment or participation; however, the failure to give such notice shall not affect any of Bank's or such holder's rights.

19.    Indemnification:

A.     Borrower and Guarantor will indemnify Bank against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs and expenses (including fees of counsel) of whatever kind or nature which may be imposed on, incurred by, or asserted at any time against Bank in any way relating to or arising in connection with the Loan and/or the use, occupation or operation of the Mortgaged Property.

B.     Borrower and Guarantor shall indemnify the Bank of any and all costs, expenses, and attorneys' fees incurred in connection with the enforcement of the terms of this commitment.

20.    Acceptance of Commitment:
The Borrower's and Guarantors Acceptance of this letter shall be evidenced by the Borrower and Guarantors executing the original of this commitment in the space provided herein and returning it to the Bank no later than _____ together with a check in the amount of $2,071.24 which represents half of the non-

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 10 of 12

refundable commitment fee, the balance of which is to be paid at closing. Borrower and Guarantors agree that no part of such commitment fee will returned to Borrower or Guarantors, either by credit against costs or expenses, or otherwise. Borrower and Guarantors agree that this commitment fee is neither interest nor payment for the use of money.   The commitment fee is paid to Bank in consideration of Bank's promise to hold or reserve the amount of this commitment and shall be fully earned by the issuance of this commitment letter.

32.   OCEAN BANK, BORROWER, AND GUARANTOR(S) SPECIFICALLY AGREE THAT THEY WAIVE ALL RIGHTS TO RELY ON OR ENFORCE ANY ORAL STATEMENTS MADE PRIOR TO OR SUBSEQUENT TO THE SIGNING OF THIS DOCUMENT.

33.   OCEAN BANK, BORROWER AND GUARANTOR(S)  HEREBY KNOWINGLY, VOLUNTARILY AND INTELLIGENTLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS DOCUMENT, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY MADE BEFORE, DURING, OR AFTER THE EXECUTION OF THIS DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE EXECUTION OF THIS DOCUMENT BY BOTH, BORROWER AND OCEAN BANK.

Sincerely,

Wayne Smith, Senior Vice President
Commercial Real Estate Credit Manager

Guillermo Molina, Senior Vice President
Commercial Real Estate Loan Officer

[BORROWER AND GUARANTORS SIGNATURE TO FOLLOW]

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 11 of 12

**The Terms and Conditions of this Commitment are hereby agreed upon and accepted this _____ day of _____, 2010.**

## BORROWER:

SAN REMO HOMES AT HOMESTEAD, , L.L.C.
A Florida Limited Liability Company

BY:   DINURO INVESTMENT LLC,
      A Florida Limited Liability Company
      (MANAGING MEMBER)

      By:_____
            Marco Romangnoli, Managing Member

      By: _____
            Roberto Romangnoli, Managing Member

BY:   STARMAC, LLC.
      A Florida Limited Liability Company
      (MANAGING MEMBER)

      By:   ROMAC, LLC.,
          a Delaware Limited Liability Company
          (SOLE  MEMBER)

          By: _____
              Javier Macedo Rodriguez, Manager

BY:   MERICI, LLC,
      A Florida Limited Liability Company
      (MANAGING MEMBER)

      By:   FELMA, LLC.
          A Florida Limited Liability Company
          (SOLE MEMBER)

          By: _____
              Felisberto Figueira Camacho, Manager

### [GUARANTORS SIGNATURES TO FOLLOW]

SAN REMO HOMES AT HOMESTEAD, LLC.
Commitment Letter
February 24, 2010
Page 12 of 12

## GUARANTORS:

_____
Marco Romangnoli, individually


_____
Roberto Romangnoli, individually


_____
Javier Macedo Rodriguez, individually


_____
Felisberto Figueira Camacho, individually



## OCEAN BANK

March 6, 2009

SAN REMO HOMES AT FLORIDA CITY, L.L.C.
10 NW Le Jeune Road, Suite 500
Miami, Florida 33126
Attention: Marco Romagnoli, Roberto Romagnoli, Felisberto Figueira Camacho, and Javier
Macedo Rodrigiez

**Re:**    **Extension of the existing maturity for Loan No. 10171114863 for twelve (12) months
subject to a 15% curtailment and twelve (12) month interest reserve requirement.**

Dear Gentlemen:

We are pleased to inform you that OCEAN BANK ("Bank") has approved the above mentioned
request subject to the following terms and conditions:

**TERMS OF LOAN:**

1.    **Borrowers:**

The Borrower for this Loan shall be **SAN REMO HOMES AT FLORIDA CITY,
L.L.C., a Florida limited liability company ("Borrower").**

2.    **Guarantor(s):**

The Loan and performance of all of the Borrower's obligations, as described herein, will
be irrevocably and unconditionally guaranteed jointly and severally (if more than one
guarantor(s)) by:

**Marco Romagnoli, Roberto Romagnoli, Felisberto Figueira Camacho, and Javier
Macedo Rodriguez**

In addition, any person who directly or indirectly owns ten percent (10%) or more of the
ownership interest in the Borrower shall also guarantee the Loan and Borrower's
obligations under the Loan Documents.

3.    **Purpose of the Loan:**

Extension of the existing maturity for twelve (12) months subject to a 15% curtailment
and twelve (12) month interest reserve requirement. Borrower intends to proceed with
the development of the subject property once applicable permits are obtained. Borrowers
has been recently approved for a tentative plat that would provide optimal land use for
future construction.

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 2 of 16

4.   **Amount:**

.The principal amount of the Loan shall be **$3,633,750.00.**

5.   **Rate of Interest:**

Prime Rate being charged by Citibank of New York plus one (1%) percent floating, calculated each day on a 360-day year, based on the outstanding principal balance during the construction period. The Rate of Interest in effect during the life of the Loan shall never be less than six and one-quarter percent (6.25%) per annum.

6.   **Terms:**

The Loan shall mature on March 1, 2010.

7.   **Repayment:**

Twelve (12) monthly payments of interest only at Prime Rate being charged by Citibank of New York plus one (1%) percent floating, calculated each day on a 360-day year, based on the outstanding principal balance during the construction period. The Rate of Interest in effect during the life of the Loan shall never be less than six and one-quarter percent (6.25%) per annum.

8.   **Collateral:**

The Loan shall be evidenced and secured by the loan documentation that shall consist of the following ("Loan Documents"):

A.   A Promissory Note in the amount of $3,633,750.00.

B.   A mortgage and security agreement ("Mortgage") creating a first mortgage upon the real estate property and improvements compromising the land and all improvements consisting of 25.72 acres of vacant land located at SW 172nd Avenue and 336th Street in Homestead, Florida.

All together with: All furniture, furnishings, fixtures, equipment, and building materials presently owned or in the future acquired, that may be found on or associated with the property and the improvements currently existing or to be built in the future, and proceeds (including but not limited to insurance proceeds) and products of the foregoing (collectively, "Mortgaged Property").

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 3 of 16

        (i)     Legal Description:

               Lot 8, Block 1, MIAMI LAND & DEVELOPMENT COMPANY'S SUBDIVISION, SECTION 19, TOWNSHIP 57 SOUTH, RANGE 39 EAST, according to the Plat thereof as recorded in Plat Book 5, at Page 10, of the Public Records of Miami-Dade County, Florida. Less that portion of said Lot 8, lying Northerly of the Southeasterly Right-of-Way of the Homestead Extension of Florida's Turnpike as shown on the Florida Department of Transportation Right-of-Way map, Section 87005-2302, sheet 5 of 12 sheets, dated April 1970.

               Lots 9 and 10, Block 1, MIAMI LAND & DEVELOPMENT COMPANY'S SUBDIVISION, SECTION 19, TOWNSHIP 57 SOUTH, RANGE 39 EAST, according to the Plat thereof as recorded in Plat Book 5, at Page 10, of the Public Records of Miami-Dade County, Florida.

C.     Assignment of Rents, Leases and Profits.

D.     UCC-1 Financing Statements required to perfect the security interests provided above.

E.     Such other documents as may be deemed necessary by the Bank, or its Counsel, in their sole discretion, to secure or service the Loan.

**9.**    **Costs and Expenses.**

A.     Commitment fee: A non-refundable commitment fee in the amount of one-half percent (0.50%) or $18,168.75, payable upon acceptance of this commitment by Borrower.

B.     Document Preparation and Closing Fee: At the time of closing, a document preparation and closing fee will be charged at the prevailing hourly rate charged by the Bank's Counsel.

C.     Underwriting Fees: A $500.00, underwriting fee will be charged at the time of closing.

D.     Out of pocket expenses: Including without limitation, any and all brokerage commissions, appraisal fees, credit report costs, title insurance costs and premiums, survey costs, recording and filing fees, documentary stamp taxes, intangible taxes, environmental assessment and any other costs and expenses associated with this Loan.

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 4 of 16

    E.    <u>Deficiencies and/or Additional Costs</u>:  Upon acceptance of this commitment, Borrower understands and hereby agrees that in the event the deposit(s) collected by the Bank, are insufficient to pay the full costs thereof the Borrower will pay any deficiency upon demand. This will also include any additional costs and expenses incurred by the Bank relative to the preparation of the closing for this Loan.

10.    <u>Contingencies</u>:

Closing will be contingent upon receipt and satisfactory review by the Bank of the following:

    (i)    Loan shall no exceed 70.95% of the reviewed appraised value.

    (ii)    Loan closing is subject to a 15% principal curtailment ant 12 month interest reserve.

    (iii)    Payment of 2008 Real Estate Taxes prior to closing.

11.    <u>Title Insurance</u>:

Mortgagee Title Insurance for the full amount of the Loan, to protect the Bank's interest in the Mortgaged Property, will be furnished to the Bank by Nicolas Fernandez, Esquire ("Title Company"). By accepting this Commitment Borrower certifies that the Title Company/Title Agent is not related and/or has any management interest in the borrowing entity. The cost of the mortgagee title insurance policy will be paid at closing by the Borrower.

12.    <u>Escrow</u>:

An Escrow account for real estate taxes and insurance will not be required.

13.    <u>Pre-Requisites to Closing</u>:

    A.    <u>Estoppel Information</u>:  Prior to closing, Borrower shall provide the Bank and/or Bank's Counsel with current, complete estoppel information on any existing prior debt.

    B.    <u>Appraisal</u>:  Prior to closing, Borrower shall provide the Bank with a satisfactory, independent appraisal of the Mortgaged Property, by an appraiser selected by the Bank. The report must reflect a value of the Mortgaged Property and such improvements with a loan to value ratio or an amount acceptable to Bank in its sole and absolute discretion.

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 5 of 16

C.    Hazard and Windstorm Insurance:  Prior to closing, Borrower shall provide the
Bank with a Multi-Peril and Windstorm Insurance Policy in a form and amount of
the insurable improvements and written by a company acceptable to the Bank. On
loans in excess of $5,000,000.00, with the exception of track housing and land
loans, the Bank will require the Borrower to obtain insurance coverage with an
insurance company that has at least a minimum rating of B+ (very good) for
property/casualty insurance coverage as determined by A.M. Best Company.
Policy will include mortgagee loss payee clause satisfactory to Bank and an
agreement to notify the Bank in writing at least thirty (30) days prior to any
cancellation or reduction in coverage. In the event that adequate coverage cannot
be secured with an approved company satisfactory to the Bank and maintained
during the terms of the Mortgage, the Bank shall have the right to accelerate the
principal outstanding balance of the Loan or force place insurance.  Property
insurance policies with windstorm deductibles greater than 5% must be approved
by Bank on an individual basis. When property insurance policies exclude
windstorm coverage in the Windstorm Pool areas, Borrower must obtain the
maximum coverage from the Florida Windstorm Underwriting Association.

D.    Liability Insurance:  Prior to closing, Borrower shall provide the Bank with a
comprehensive general commercial liability insurance policy for the benefit of the
Borrower and Ocean Bank, naming Ocean Bank as an additional insured. On
loans in excess of $5,000,000.00, with the exception of track housing and land
loans, the Bank will require the Borrower to obtain insurance coverage with an
insurance company that has at least a minimum rating of B+ (very good) for
property/casualty insurance coverage as determined by A.M. Best Company. In
the event that adequate coverage cannot be secured with an approved company
satisfactory to the Bank and maintained during the terms of the Mortgage, the
Bank shall have the right to accelerate the principal outstanding balance of the
Loan or force place insurance.

E.    Flood Insurance:  Prior to closing, Borrower shall provide the Bank with a flood
insurance policy if the Mortgaged Property is in a "Special Flood Hazard Area",
as defined by the Flood Insurance Rate Map issued by the Department of Housing
and Urban Development. The policy will include a mortgagee loss payee clause
satisfactory to the Bank and an agreement to notify the Bank in writing, at least
thirty (30) days prior to any cancellation or reduction in coverage.  On loans in
excess of $5,000,000.00, with the exception of track housing and land loans, the
Bank will require the Borrower to obtain insurance coverage with an insurance
company that has at least a minimum rating of B+ (very good) for
property/casualty insurance coverage as determined by A.M. Best Company. In
the event that adequate coverage cannot be secured with an approved company
satisfactory to the Bank and maintained during the terms of the Mortgage, the

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 6 of 16

Bank shall have the right to accelerate the principal outstanding balance of the Loan or force place insurance.

F. <u>Survey:</u> Prior to closing, the Borrower shall provide the Bank with three (3) original, sealed surveys for the Mortgaged Property, performed by a duly registered land surveyor, and certified to Ocean Bank, its successors and/or its assigns, the Borrower, the attorney preparing the title insurance, and the Title Insurance Company, dated within sixty (60) days prior to the closing. The survey must reflect the correct legal description of the Mortgage Property, shall show the location and perimeter boundaries of the Mortgaged Property, shall disclose access, elevations, all improvements, encroachments, easements and rights-of-way, and shall reflect no conditions unsatisfactory to Bank, its Counsel or the Title Company. Borrower shall be responsible for the total cost of the survey.

G. <u>Environmental Audit:</u> Prior to closing, Borrower shall, at Borrower's expense, provide the Bank with an Environmental Phase I report adhering to the new, revised AAI Compliant Phase I Site assessment or ASTME 1527-05 Standard, certified by an environmental engineer, acceptable to the bank, evidencing that there are no hazardous waste or asbestos containing materials (ACM's), as defined by federal, state or local law, of any kind, stored, kept, disposed upon or otherwise affecting the Mortgaged Property or any portion thereof. In the event said report indicates there are any such hazardous wastes or materials, Bank may, in its sole and absolute discretion, either (i) require as a condition to closing that all appropriate corrective action be taken or (ii) cancel and terminate this commitment, either course of action without further liability or obligation to Bank. Borrower expressly represents to Bank that the Mortgaged Property and the improvements thereon are not presently being used, and will not in the future be used for the handling, storage, transportation, or disposal of hazardous or toxic materials. Borrower agrees to indemnify, defend, and hold harmless from and against any loss to Bank, including, without limitation, attorney's fees, incurred by storage, transportation, or disposal of hazardous or toxic materials. The foregoing indemnification and other provisions of this paragraph shall survive repayment of the Loan.

H. <u>Taxes, Assessments and Charges:</u> Prior to closing, Borrower shall provide to the Bank evidence, satisfactory to the Bank that all real estate taxes, assessments, charges, liens, etc., have been paid in full.

I. <u>Opinion Letter:</u> Prior to closing, Borrower shall provide to the Bank an opinion letter from Borrower's attorney confirming Borrower's and Guarantor(s) authority to enter into the Loan, to execute the Loan Documents and that there is no litigation or claims existing or threatened against the Borrower and/or Guarantor(s).

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 7 of 16

J.      Leases:  Borrower shall provide to Bank with copies of all leases affecting the
        Mortgaged Property along with credit reports, financial information and resumes
        on each tenant.  Each lease must be in form and substance acceptable to the Bank
        and shall be subordinated to the lien of this Mortgage.  Upon expiration and/or
        renewal of any of the leases, Borrower shall provide the Bank with copies of the
        executed new leases.

K.      Borrower shall submit to the Bank all joint venture agreements, limited
        partnership agreements, and trust agreements in connection with this Loan and
        such agreements must be approved by the Bank and the Bank's Counsel.

L.      Borrower, if a corporation, partnership or other business entity, shall provide to
        the Bank, evidence that it is duly organized, validity existing and in Good
        Standing under the laws governing its organization or incorporation and has full
        power and authority to consummate this transaction.

M.      Borrower shall provide the Bank with a roof and structural inspection from a
        licensed roofer and engineer, stating that the roof and the structure are sound and
        in good repair.

N.      Borrower shall provide the Bank, a termite inspection from a licensed
        exterminator, stating that the improvements are free of termites and termite
        damage.

O.      Borrower shall provide to the Bank, satisfactory evidence from the proper
        governmental agency that a licensed Florida architect or engineer has inspected
        the building and found it structurally safe, in conformity with the "Recommended
        Minimum Procedural Guidelines for Building Recertification", for structures forty
        (40) years or older.

P.      Borrower shall provide to the Bank, its' IRS Identification Number for tax
        reporting purposes relating to interest.


14.     **Bank's Counsel:**

        ROBERTO F. FLEITAS, JR., P.A., 782 NW LE JEUNE RD., # 530, MIAMI, FLORIDA
        33126 will act as Counsel to the Bank in regard to this matter.

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 8 of 16

15. **Loan Documents:**

Bank's Counsel shall prepare the necessary documentation in order to comply with all the terms and conditions of this commitment and to comply with applicable law.  The Loan Documents, as to form and content, are to be acceptable to the Bank's Counsel, are to be joined by all signatories required to create the security interest provided for herein, and are to include all terms and provisions customarily incorporated into such documents. Legal costs shall be borne by Borrower.  Bank's Counsel shall be responsible for the recording of the Mortgage and all other recordable Loan Documents, including UCC Filings filed with the Secretary of the State of Florida, as well as any documents necessary to perfect title in the Borrower and insure the Bank's lien position in the Mortgage and any other security document.

16. **Closing:**

The closing of this transaction shall be held on or before ninety (90) days from the date of the acceptance of this commitment unless delayed by the Bank or its attorneys. The closing shall take place at the offices of the Counsel for the Bank and the exact date and time shall be scheduled by such Counsel upon providing the Borrower with prior notice. The Bank shall not be required to establish a closing date unless the Borrower shall have complied with all the conditions and requirements set forth herein.  Unless the closing is held within said ninety (90) day period, the Bank's obligation hereunder will, at its option, terminate.

17. **Survival:**

This commitment and all terms and provisions hereof shall survive the closing of the Loan and shall be merged into the Loan Documents.  In the event of any conflict among the terms and provisions of this commitment and the Note and Mortgage provided for herein, then the terms and provisions of the Note and Mortgage shall control.

18. **Borrower's Covenants:**

A.     Bank Accounts:  Borrower covenants to and agrees with the Bank that, for so long as any obligations under the Note shall be outstanding; Bank shall be the prime depository for the personal and business accounts of Borrower. Borrower recognizes that such covenant and agreement was an important factor and a material inducement to the Bank in establishing the terms and conditions, including the interest rate, of the Loan evidenced by this Note.  If Borrower violates this covenant and agreement, Bank may elect, upon written notice to any one Borrower, mailed to its address as shown on the Bank's records, to increase the interest rate set forth in the Note to a rate specified in such notice, which rate

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 9 of 16

    shall not exceed the maximum permissible legal rate, effective from the date of such notice.

B.    <u>Financial Statements:</u>  Borrower hereby agrees to provide current, complete financial statements of Borrower and every Limited Guarantor(s) in form and content satisfactory to the Bank.  Borrower further agrees to provide such statements annually at its own expense, as long as the Loan is outstanding.

C.    <u>No Secondary Financing Allowed:</u>  Borrower hereby agrees that it will not obtain any secondary financing on the Mortgaged Property which secures the Loan from the Bank to Borrower, or otherwise encumber said property without the prior written consent of the Bank.

D.    <u>Restriction on change of ownership and further encumbrances:</u>  Borrower agrees that Borrower's right under this commitment and the Loan shall be personal since the Bank has evaluated this Loan and has agreed to make this Loan based on the unique qualifications of Borrower and Guarantor(s), both financial and otherwise.  So long as this commitment or any part of the Loan is outstanding, the Mortgaged Property shall remain free and clear of all other encumbrances, liens, mortgages, security interest and secondary financing, and Borrower shall not, without prior written consent of Bank, sell, transfer, encumber or convey all or any part of its interest in the Mortgaged Property or any portion thereof.  Additionally, any change in the present stock ownership of the borrowing corporation or change in partnership structure or other breach of the foregoing provision shall constitute a default under the Note and Mortgage, or if prior to closing, shall constitute grounds for terminating this commitment.

E.    <u>New Appraisal:</u>  The Bank shall have the right to conduct or have conducted by an independent appraiser acceptable to the Bank updated appraisals of the Mortgaged Property in form and substance satisfactory to the Bank at the sole cost and expense of Borrower; provided, however, that Borrower shall not be obligated to bear the expense of more than one such appraisal in any six (6) month period unless: (a) an event of default exists, or (b) such appraisal is required by applicable law, rule or regulation of any governmental authority having jurisdiction over the Bank.  The cost of such appraisals, if chargeable to Borrower as aforesaid shall be secured by the Mortgage.

F.    <u>Control Business/Affiliate Relationship with Title Agent:</u>

    N/A

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 10 of 16

19.   **Sale of Loan Documents:**

The Bank may from time to time, without prior notice to Borrower and/or Limited Guarantor(s), as the context so requires, sell or assign, in whole or in part, or grant participations in, the Loan, the Note, the Mortgage and/or the obligations evidenced thereby. The holder of any such sale, assignment or participation, if the applicable agreement between the Bank and such holder so provides, shall be: (a) entitled to all the rights, obligations and benefits of the Bank; and (b) deemed to hold and may exercise the rights of setoff or banker's lien with respect to any and all obligations of such holder to Borrower and/or Limited Guarantor(s), as the context so requires, in each case as fully as thought Borrower and/or Limited Guarantor(s), as the context so requires, were directly indebted to such holder. Bank may in its discretion give notice to Borrower and/or Limited Guarantor(s), as the context so requires, of such sale, assignment or participation; however, the failure to give such notice shall not affect any of Bank's or such holder's rights.

20.   **Compliance:**

Bank's obligations under this commitment are subject to the requirements of the supervisory authorities regulating Bank, and all applicable federal and state laws and regulations, including without limitation, those related to lending limits. If the terms of this commitment or the obligations of the Bank hereunder conflict with any applicable law or regulation, such law or regulation shall control over and supersede any such conflicting term or obligation. Borrower agrees that Bank shall have no liability whatsoever to Borrower, Limited Guarantor(s) of any third party, including any intended or incidental beneficiary hereof, as a result of any such conflict, and Borrower and Limited Guarantor(s) shall indemnify and exculpate Bank from all liabilities, costs and attorney's fees resulting from any such conflict.

21.   **Indemnification:**

A.   Borrower will indemnify Bank against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs and expenses (including fees of counsel) of whatever kind or nature which may be imposed on, incurred by, or asserted at any time against Bank in any way relating to or arising in connection with the Loan and/or the use, occupation or operation of the Mortgaged Property.

B.   Borrower shall indemnify the Bank of any and all costs, expenses, and attorneys' fees incurred in connection with the enforcement of the terms of this commitment.

22.   **Anti-Money Laundering Laws:**

To the best of Borrower's knowledge, after making due inquiry, neither Borrower, Limited Guarantor(s), nor any person providing funds to Borrower:

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 11 of 16

(i)    is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined in this Section);

(ii)    has been assessed civil or criminal penalties under Anti-Money Laundering Laws; or

(iii)    has had any of its funds seized or forfeited in any action under any anti-Money Laundering Laws.

For purposes of this Subsection (i), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that (a) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (c) require identification and documentation of the parties with whom a financial institution conducts business; or (d) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

23.    **Borrower Compliance with Patriot Act:**

Borrower represents to Bank that it is in compliance with any and all applicable provisions of the Patriot Act.

24.    **Non-Assignability:**

Neither this commitment nor any of the proceeds of the Loan shall be assignable by Borrower, and any attempt to make such assignment shall be void.

25.    **Time is of the Essence:**

Time is of strict essence as to Borrower's performance of each and every condition to be performed by Borrower and with respect to all dates and periods of time set forth in this commitment.

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 12 of 16

26.    **Bank's Expenses:**

This transaction is to be handled without cost and expense to the Bank and the Bank is to be held harmless from any and all expenses relating thereto, including but not limited to, all claims of brokerage in any way related to this transaction, appraisal and credit report cost, if any, title insurance cost, legal fees incurred by the Bank, survey cost, recording charges, documentary stamp taxes, intangible taxes, etc

27.    **Broker Involvement:**

In as much as the Borrower has dealt directly with Ocean Bank and has not used a Broker, both parties hereby warrant that there is no Broker involved in this transaction, and that no claims shall be made by any Broker whatsoever.

28.    **Amendments:**

This commitment may be amended only by a written amendment executed by the Bank and the Borrower and is not assignable without prior consent of the Bank.

29.    **Accuracy of Representation:**

This commitment assumes the accuracy of all information, representations, exhibits and other matters submitted to the Bank by the Borrower and presupposes no material adverse change in the state of facts indicated therein, prior to the closing of this transaction.

30.    **Cancellation of Commitment:**

This commitment will be considered null and void if any of the following conditions exist prior to closing:

A.    Appraisal report was not accepted by the Bank.

B.    Borrower's failure to comply with the terms and conditions of this commitment.

C.    Deterioration of the financial condition of the Borrower, including but not limited to, the filing by the Borrower of a petition in bankruptcy or insolvency, or for the appointment of a receiver or trustee, or the making of an assignment for benefit of creditors.

D.    Any action, suit, or proceedings at law, or in equity, or before or by any governmental authorities is instituted or pending, or is to Borrower's knowledge

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 13 of 16

threatened against, or affecting Borrower, or the realty and personality which is security for the Loan, or involving the validity or enforceability of any documents which are required for the Loan, or the priority of the required lien position, with respect to the security.

E.  Any adverse condition that shall affect any property which secures the Loan, including but not limited to, the status of title or physical condition.

F.  The commitment shall be canceled, null and void if the Loan is not closed on or before ninety (90) days from the effective date of acceptance of said commitment.

31.  **Acceptance of Commitment:**
The Borrower's Acceptance of this letter shall be evidenced by the Borrower executing the original of this commitment in the space provided herein and returning it to the Bank no later than _____ together with a check in the amount of $18,168.75 which represents the non-refundable commitment fee. Borrower agrees that no part of such commitment fee will returned to Borrower, either by credit against costs or expenses, or otherwise. Borrower agrees that this commitment fee is neither interest nor payment for the use of money. The commitment fee is paid to Bank in consideration of Bank's promise to hold or reserve the amount of this commitment and shall be fully earned by the issuance of this commitment letter.

32.  OCEAN BANK, BORROWER, AND GUARANTOR(S) SPECIFICALLY AGREE THAT THEY WAIVE ALL RIGHTS TO RELY ON OR ENFORCE ANY ORAL STATEMENTS MADE PRIOR TO OR SUBSEQUENT TO THE SIGNING OF THIS DOCUMENT.

33.  OCEAN BANK, BORROWER AND GUARANTOR(S) HEREBY KNOWINGLY, VOLUNTARILY AND INTELLIGENTLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS DOCUMENT, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY MADE BEFORE, DURING, OR AFTER THE EXECUTION OF THIS DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE EXECUTION OF THIS DOCUMENT BY BOTH, BORROWER AND OCEAN BANK.

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 14 of 16

Sincerely,

_____
Wayne Smith, Senior Vice President
Commercial Real Estate Credit Manager

_____
Guillermo Molina, Senior Vice President
Commercial Real Estate Loan Officer

*APPROVED AS TO FORM
AND LEGAL SUFFICIENCY*

By:_____
        Roberto F. Fleitas Jr.,
        Attorney-at-Law

**[BORROWER'S SIGNATURES TO FOLLOW ON NEXT PAGE]**

The Terms and Conditions of this Commitment are hereby agreed upon and accepted this
_____ day of _____, 2009,

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 15 of 16

## BORROWER:

SAN REMO HOMES AT FLORIDA CITY, L.L.C.
A Florida Limited Liability Company

BY:  DINURO INVESTMENT LLC,
     A Florida Limited Liability Company
     (MANAGING MEMBER)

      By:_____
          Marco Romangnoli, Managing Member

      By:_____
          Roberto Romangnoli, Managing Member

BY:  STARMAC, LLC.
     A Florida Limited Liability Company
     (MANAGING MEMBER)

      By:  ROMAC, LLC.,
          a Delaware Limited Liability Company
          (SOLE MEMBER)

          By:_____
             Javier Macedo Rodriguez, Manager

BY:  MERICI, LLC.,
     A Florida Limited Liability Company
     (MANAGING MEMBER)

      By:  FELMA, LLC.
          A Florida Limited Liability Company
          (SOLE MEMBER)

          By:_____
             Felisberto Figueira Camacho, Manager

### [GUARANTORS SIGNATURES TO FOLLOW ON NEXT PAGE]

SAN REMO HOMES AT FLORIDA CITY, LLC.
Commitment Letter
March 6, 2009
Page 16 of 16

**GUARANTORS:**

_____

Marco Romangnoli, individually

_____

Roberto Romangnoli, individually

_____

Javier Macedo Rodriguez, individually

_____

Felisberto Figueira Camacho, individually

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI, MIAM-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION DIVISION (40)
CASE NO.:  11-10900 CA (01)
Consolidated for Discovery Only with Case No.: 11-10901 CA (40)

DINURO INVESTMENTS, LLC., a
Florida limited liability company,

        Plaintiff,

vs.

FELISBERTO FIGUEIRA CAMACHO,
FELMA, LLC., a Florida limited liability
company, et al.,

        Defendants.

_____/

ORDER APPROVING CIVIL GENERAL MAGISTRATE'S
REPORT AND RECOMMENDATION ON GRANTING DEFENDANTS' MOTION FOR
PROTECTIVE ORDER STAYING DISCOVERY AND ON PLAINTIFF'S MOTION TO
OVERRULE OBJECTIONS TO SUPOENA DUCES TECUM TO NON-PARTY SAN
REMO HOMES AT HOMESTEAD, LLC.

      THIS CAUSE came before the Court without a hearing upon the Magistrate's

Report and Recommendation, and the Court having considered the findings and

recommendations therein, and being advised that no exceptions to the Magistrate's

Report have been filed within the time provided by Fla. R. Civ. P. 1.490(h), it is

      ORDERED AND ADJUDGED as follows:

1.    That the General Magistrate's Report and Recommendation dated

      December 8, 2011 be and the same is hereby ratified and approved;

2.    The Court adopts each and every recommendation contained therein as this

      Court's Order;

Case No.: 11-10900 CA (40)
Consolidated for Discovery Only w/Case No.: 11-10901 CA (40)

3.     The parties are ordered to abide by all findings and recommendations

contained in the Magistrate's Report; and

4.     All prior Orders not inconsistent herewith are reaffirmed.

DONE AND ORDERED in Chambers in Miami, Miami-Dade County,

Florida this 26th day of January, 2012.

GILL S. FREEMAN
CIRCUIT COURT JUDGE

Copies furnished to:
CARLOS F. CONCEPTION, Esq.
SCOTT A. BURR, Esq.
PATRICIA A. MONTES DE OCA, Esq.
CONCEPCION MARTINEZ BELLIDO
255 ARAGON AVE # 2ND FL
CORAL GABLES, FL 33134

JORGE E. OTERO, Esq.
JORGE E. OTERO & ASSOCIATES
75 VALENCIA AVE # 2ND FL
CORAL GABLES, FL 33134

STEVEN M. EBNER, Esq.
SHUTTS & BOWEN, LLP
201 SO. BISCAYNE BLVD # 1500
MIAMI, FL 33131

WILFREDO A. RODRIGUEZ, Esq.
AVILA RODRIGUEZ ET AL
2525 PONCE DE LEON BLVD # 1225
CORAL GABLES, FL 33134

**Conformed Copy**

JAN 2 6 2012

Gill S. Freeman
Circuit Court Judge

2